No. 24-2350

———————— ◆ ————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————— ◆ ————————

CITY OF BUFFALO, ET AL.,
*Plaintiffs-Appellees*,

v.

HYUNDAI MOTOR AMERICA AND KIA AMERICA, INC.,
*Defendants-Appellants*.

———————— ◆ ————————

On Appeal from the United States District Court
for the Central District of California

———————— ◆ ————————

## *AMICUS CURIAE* BRIEF OF THE BUCKEYE INSTITUTE
## IN SUPPORT OF APPELLANTS AND REVERSAL

———————— ◆ ————————

David C. Tryon
*Counsel of Record*
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

*Attorney for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(a)(4)(A) and 26.1 of the Federal Rules of Appellate Procedure, amicus curiae The Buckeye Institute states that it has no parent corporation and it issues no stock, thus no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF CONTENTS ..........................................................................ii

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICUS CURIAE* ...........................................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ...........................................................................................5

   I.   While reasonable foreseeability is necessary to establish proximate cause, it is not enough ...........................................................................5

   II.  The remedy for nuisance is equitable abatement, not monetary damages...........................................................................................9

   III. The 1998 tobacco settlement shows how governments redirect funds designated for curing a particular social ill .....................................18

CONCLUSION ......................................................................................23

CERTIFICATE OF COMPLIANCE .......................................................24

CERTIFICATE OF SERVICE...............................................................25

# TABLE OF AUTHORITIES

**Cases**

*Ashtabula River Corp. Group II v. Conrail, Inc.*,
  549 F.Supp.2d 981 (N.D. Ohio 2008) .....................................................9

*Brown v. Scioto Cty. Bd. of Commrs.*,
  622 N.E.2d 1153 (Ohio 4th Dist. 1993) .......................................14, 17

*Cameron v. United States*,
  148 U.S. 301 (1893) ................................................................................17

*Cascone v. Herb Kay Co.*,
  451 N.E.2d 815 (Ohio 1983) ............................................................5, 6

*Cirino v. Ohio Bur. of Workers' Comp.*,
  106 N.E.3d 41 (Ohio 2018) ..................................................................10

*City of Toledo v. Jackson Indus. Corp.*,
  2018-Ohio-2592 (6th Dist.) ..................................................................10

*Columbus v. Wood*,
  2016-Ohio-3081 (10th Dist.) ...................................................................5

*Kramer v. Angel's Path, L.L.C.*,
  882 N.E.2d 46 (Ohio 6th Dist.) .............................................................17

*Menifee v. Ohio Welding Products, Inc.*,
  472 N.E.2d 707 (Ohio 1984) ...................................................................5

*Motorists Mut. Ins. Co. v. Ironics, Inc.*,
  200 N.E.3d 149 (Ohio 2022) ...................................................................9

*Mugler v. Kansas*,
  123 U.S. 623 (1887) ........................................................................11, 17

*Mussivand v. David*,
  544 N.E.2d 265 (Ohio 1989) ............................................................5, 6

*Parker v. Winnipiseogee Lake Cotton & Woolen Co.*,
  67 U.S. 545 (1863) ................................................................................17

*People v. ConAgra Grocery Prod. Co.*,
17 Cal.App.5th 51, 227 Cal.Rptr.3d 499 (2017) ..................................................15

*Postal Instant Press v. Jackson*,
658 F. Supp. 739 (D.Colo. 1987) ..........................................................................18

*Rieger v. Giant Eagle, Inc*,
138 N.E.3d 1121 (Ohio 2019) ............................................................................2, 5

*Ross v. Nutt*,
203 N.E.2d 118 (Ohio 1964) ...................................................................................2

*Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*,
2022-Ohio-3031 (8th Dist.)..............................................................................14, 15

*Sizemore v. Deemer*,
174 N.E.3d 5 (Ohio 3rd. Dist. 2021) ......................................................................5

*State ex rel. Great Lakes Coll., Inc. v. Med. Bd.*,
280 N.E.2d 900 (Ohio 1972) .................................................................................10

*State ex rel. Miller v. Anthony*,
647 N.E.2d 1368 (Ohio 1995) .........................................................................16, 17

*State, ex rel. Rear Door Bookstore v. Tenth Dist. Ct. of Appeals*,
588 N.E.2d 116 (Ohio 1992) .................................................................................10

**Other Authorities**

1 George Santayana, *The Life of Reason* (1905) ......................................................18

2 Joseph Story, *Commentaries on Equity Jurisprudence* §§ 921, 922 (1839) ........11

Aaron Gordon, *U.S. Cities Have a Staggering Problem of Kia and Hyundai Thefts. This Data Shows It*., Vice (Sept. 21, 2023) .................................................7

ABATEMENT, Black's Law Dictionary (11th ed. 2019) ......................................10

Adam Coretz, Note, *Reparations for A Pub. Nuisance? The Effort to Compensate Survivors, Victims, & Descendants of the Tulsa Race Massacre One Hundred Years Later,* 43 Cardozo L. Rev. 1641 (2022) .............................13

*Broken Promises to Our Children*, Campaign for Tobacco Free Kids ..................19

iv

Donald G. Gifford, *Pub. Nuisance as a Mass Products Liab. Tort*, 71 U.Cin.L.Rev. 741 (2003) ........................................................12, 15

*Hyundai and Kia car thefts fall sharply after software upgrade, study finds*, CBS News (Aug. 7, 2024) ........................................................8

Ken Slenkovich, *Ohio's Tobacco Master Settlement Agreement: History, Lessons Learned and Considerations for Ohio*, The Center for Community Solutions ........................................................20, 21

Madeleine List, *TikTok trend blamed for spike in car thefts. These brands are being targeted the most.*, Miami Herald (July 5, 2022) ........................................................8

Micah L. Berman, *Using Opioid Settlement Proceeds for Public Health: Lessons from the Tobacco Experience*, 67 U. Kan. L. Rev. 1029 (2019) ............22

Michele Gilbert, *What History's Big Tobacco Settlement Means for Today's 'Opiod Remediation'*, Bipartisan Policy Center (Aug. 19, 2021) ........................19

Mike Berardino, *Mike Tyson explains one of his most famous quotes*, South Florida Sun-Sentinel ........................................................21

Restatement (Second) of Torts § 821C (Am. Law Inst. 1979) ........................12

Rita Liao & Catherine Shu, *TikTok's epic rise and stumble*, Tech Crunch (Nov. 26, 2020) ........................................................8

Thomas C. Capehart, *Trends in the Cigarette Industry After the Master Settlement Agreement*, U.S Dept. of Agriculture (2001) ........................19

Victor E. Schwartz & Phil Goldberg, *The Law of Pub. Nuisance: Maintaining Rational Boundaries on A Rational Tort*, 45 Washburn L.J. 541 (2006) 13, 15, 16

William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997 (1966) ........................................................14

## INTERESTS OF *AMICUS CURIAE*[1]

*Amicus curiae* The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy. The staff at The Buckeye Institute accomplishes the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policy solutions, and marketing those policy solutions for implementation in Ohio and replication throughout the country. The Buckeye Institute is a nonpartisan, non-profit, tax-exempt organization as defined by I.R.C. section 501(c)(3). The Buckeye Institute files and joins amicus briefs that are consistent with its mission.

The Buckeye Institute is dedicated to promoting free-market policy solutions and protecting individual liberties, especially those liberties guaranteed by the Constitution of the United States, against government overreach. While government overreach often comes through rules or legislation, government suits against private companies, founded on novel nuisance and negligence theories can be just as onerous. Worse still, government nuisance suits—both as a way to raise revenue and

---

[1] Pursuant to Rule 29(a), The Buckeye Institute states that all parties have given consent to file this amicus brief. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission.

achieve policy goals they are unable to achieve through legislation or rulemaking—allow governments to avoid political accountability and place politically unpopular or deep-pocketed industries in the crosshairs of local governments looking for new revenue sources.

The Buckeye Institute has filed amicus briefs on the perils and misuse of government litigation in various circuit courts as well as the Ohio Supreme Court.

## SUMMARY OF ARGUMENT

Every first-year law student learns that the elements for a negligence claim are the existence of a duty, a breach of that duty, and an injury that was proximately caused by the breach. *Rieger v. Giant Eagle, Inc*, 138 N.E.3d 1121 (Ohio 2019). Digging deeper, they inquire into what it means for an injury to be proximately caused. They find that Ohio's common law, like most jurisdictions, links causation to the foreseeability of the injury by the wrongdoer. More precisely, in Ohio, "proximate cause 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.'" *Ross v. Nutt*, 203 N.E.2d 118, 120 (Ohio 1964). The need for foreseeability is crucial from both a moral and public policy perspective: The hortatory purpose of negligence and nuisance law—encouraging citizens not to act negligently—is served only where

people can appreciate the likely results of their actions or failures to act. Consistent with that hortatory purpose, Ohio law, like most jurisdictions, has long recognized that a criminal act by a third party will break the chain of foreseeability and thus causality. This case presents an especially attenuated chain of causality, asking manufacturers to anticipate not only potential third-party criminal actions but third parties taking to social media to encourage others to engage in criminal acts, as well as criminals adapting to manufacturers' countermeasures. While Ohio law expects people to avoid foreseeable risks to others proximately caused by their conduct, it does not demand divination of all possible costs to all parties, particularly local governments that are the ones failing to fulfill their responsibility to dissuade criminal activity. Moreover, Plaintiffs' negligence claims run afoul of Ohio's economic loss doctrine.

Equally troubling is that the remedy that the local governments seek for their nuisance claim is not merely abatement—but monetary damages. In recent decades, local governments have turned increasingly to litigation to subsidize their operations and achieve policy outcomes that they have not been able to achieve through legislation, rulemaking, and enforcement. These suits sometimes, as here, seek damages under the theory of public nuisance. They also typically target deep-pocketed companies or entire industries to fund the government's efforts to remedy some societal ill.

The other unfortunate commonality in these suits is that the harm that they seek to address is typically caused—at least in part—by independent third-party actors. Thus, local governments have sued firearms manufacturers for third parties' criminal acts. They have sued drugstore chains for government costs incurred from opioid addiction, despite the fact that the drugstore chains had no role in prescribing or manufacturing the drugs. They have sued banks for giving mortgages to customers who later defaulted. These suits are inconsistent with Ohio's nuisance jurisprudence. Moreover, they create a type of moral hazard for state and local governments. Suits and settlements allow local governments to raise funds from unpopular or denigrated industries to fund government generally. This bypasses the political process and gives government entities windfalls to spend with little accountability.

Ohio's experience with funds from the 1998 national tobacco settlement, a case brought under similar theories to those advanced here, is illustrative. There, settlement cash, much like the substance that generated it, proved to be addictive. Funds that were "earmarked" for tobacco-use prevention soon became available for general spending. This availability of easy money creates a perverse incentive for governments to target unpopular or deep-pocketed companies and industries to fund or supplement their operations. This is inconsistent with the separation of legislative and judicial power.

## ARGUMENT

### I. While reasonable foreseeability is necessary to establish proximate cause, it is not enough.

Negligence claims require that the plaintiff prove that the defendant proximately caused the Plaintiff's injury. *Rieger*, 138 N.E.3d at 1125. "To establish proximate cause, foreseeability must be found." *Columbus v. Wood,* 2016-Ohio-3081, ¶ 11 (Ohio 10th Dist.). But "[Ohio does] not equate foreseeability with proximate cause." *Mussivand v. David*, 544 N.E.2d 265, 272 (Ohio 1989). Further, "[i]t is important to emphasize that an intervening act can break the causal connection between negligence and injury. *Wood*, 2016-Ohio-3081, at ¶ 11. "The test * * * is whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor." *Sizemore v. Deemer*, 174 N.E.3d 5, 10–11 (Ohio 3rd. Dist. 2021) (citing *Cascone v. Herb Kay Co.*, 451 N.E.2d 815, 819 (Ohio 1983)). And it is dependent upon the reasonable person standard, i.e. "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee v. Ohio Welding Products, Inc.*, 472 N.E.2d 707, 710 (Ohio 1984).

But whether

an intervening cause "breaks the causal connection between negligence

> and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence. If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence."

*Mussivand*, 544 N.E.2d at 272 (internal citations omitted). A defendant cannot be liable if the intervening cause "was a conscious and responsible agency which could or should have eliminated the hazard" and "the intervening cause was reasonably foreseeable by the one who is guilty of the negligence."[2] *Id.* (citing *Cascone*, 451 N.E.2d at 816, paragraph one of the syllabus (1983)).

In this case, the plaintiffs' alleged damages depend—in part—on the supposed foreseeability of the rash of the car thefts. While a car manufacturer has contractual or product liability duties to purchasers, a manufacturer would not have any duty in tort to local governments because of the multiple "conscious and responsible agencies"—i.e. the thieves, the TikTok video creators, TikTok posters and re-posters, the existence of TikTok, and TikTok itself—"which could have eliminated the hazard"—intervening between the manufacturer and the plaintiff governments. While it may be foreseeable that a few thieves might discover and exploit a vulnerability to steal cars, the damages alleged here require that the manufacturers foresee a social media phenomenon encouraging criminal behavior, the failure of

---

[2] These factual questions were left for the jury.

social media companies to enforce their own policies against encouraging such criminal behavior, the sharing and spreading of videos encouraging car theft by thousands of individuals, and other individuals choosing to act on that encouragement. Such a chain is so attenuated that it could make any manufacturer responsible for any criminal act related to its product.

Further, while it may seem obvious, the injury must have been anticipated at the time the alleged tort-feasor performed the act. In this case, that is the date the vehicle is manufactured. The vehicles involved here were manufactured between 2011 and 2021. But the Hyundai/Kia theft epidemic did not materialize until 2022, long after the vast majority of the vehicles had been manufactured. Aaron Gordon, *U.S. Cities Have a Staggering Problem of Kia and Hyundai Thefts. This Data Shows It.*, Vice (Sept. 21, 2023).[3] Indeed, "Until mid-2022, Kias and Hyundais were stolen in most cities for which we have data in line with ownership rates of between five and 10 percent." *Id*. Even in Milwaukee, which is largely cited as the epicenter of the trend," the drastic increase in these thefts did not begin until June 2021. *Id*. The nationwide explosion of these thefts appears to coincide with the TikTok video posted in July 2022 showing how to hotwire the cars. Madeleine List, *TikTok trend*

---

[3] https://www.vice.com/en/article/us-cities-have-a-staggering-problem-of-kia-and-hyundai-thefts-this-data-shows-it/.

*blamed for spike in car thefts. These brands are being targeted the most.*, Miami Herald (July 5, 2022).[4]

The manufacturers could not have foreseen that someone would figure out a theft methodology, and a simple one that could be easily replicated, make TikTok videos, and post them. Nor could they have foreseen that the videos would "go viral." Indeed, in 2010, the first year of manufacture of the subject vehicles, they could not have foreseen the creation and USA release of TikTok eight years later in 2018. Rita Liao & Catherine Shu, *TikTok's epic rise and stumble*, Tech Crunch (Nov. 26, 2020).[5] They also could not have foreseen the widespread, and shameful, defiance of the law—mass felonious criminal activity. We expect that, with the exception of a few bad apples in society, Americans will obey the law and not steal from their fellow Americans. Perhaps in 2022, when all these intervening events came to light, the end result became foreseeable—and that is when Hyundai implemented an "extremely effective" solution for those model years. *Hyundai and Kia car thefts fall sharply after software upgrade, study finds*, CBS News (Aug. 7, 2024).[6]

Finally, while parties are liable for economic damages resulting from breach of contract or quasi-contract, Ohio's "economic-loss rule generally prevents

---

[4] https://www.miamiherald.com/news/nation-world/national/article263801328.html.

[5] https://techcrunch.com/2020/11/26/tiktok-timeline/.

[6] https://www.cbsnews.com/news/kia-hyundai-car-theft-software-upgrade/.

recovery in *tort* of damages for purely economic losses. The well-established general rule is that a plaintiff who has suffered only economic loss due to another's *negligence* has not been injured in a manner which is legally cognizable or compensable." *Ashtabula River Corp. Group II v. Conrail, Inc.*, 549 F.Supp.2d 981, 987 (N.D. Ohio 2008) (emphasis added) (internal citations omitted). The economic-loss doctrine is based on differences between tort law and contract law . . . ." *Motorists Mut. Ins. Co. v. Ironics, Inc*., 200 N.E.3d 149, 160 (Ohio 2022). "Recovery in tort seeks to restore the plaintiff to where he was before the defendant's wrongful conduct *injured* him, whereas contract law seeks to put the plaintiff where he would be had the defendant properly performed his duty under the contract." *Id*. (emphasis added). Plaintiffs seek contract damages for a tort claim. Ohio does not allow that.[7]

## II. The remedy for nuisance is equitable abatement, not monetary damages.

Beyond the attenuated chain of proximate cause, to the extent that the plaintiffs proceed under a statutory or common law nuisance theory, this case raises a fundamental issue regarding the remedies available under those theories. Specific remedies are designed to address specific wrongs. And equitable remedies are different than legal remedies. The permissible relief for public nuisances are the

---

[7] There are exceptions to the economic loss doctrine, but none apply here. Plaintiffs' additional claims for monetary damages for public nuisance also fail. And Federal courts applying Ohio law have recognized the distinction between actions founded on negligence and those based on public nuisance.

equitable remedies of injunctions and abatement—not monetary damages. Injunctions tell the offender not to do something. *State ex rel. Great Lakes Coll., Inc. v. Med. Bd.*, 280 N.E.2d 900, 903 (Ohio 1972) ("An injunction ordinarily is employed to prevent future injury . . . ."). And to abate something is to stop it, or to "eliminat[e] or nullify[]" it. ABATEMENT, Black's Law Dictionary (11th ed. 2019). See also *City of Toledo v. Jackson Indus. Corp.*, 2018-Ohio-2592, ¶ 32 (Ohio 6th Dist.) ("The dictionary definitions of 'abate' include 'to decrease in force or intensity * * * to decrease in amount of value * * * to put an end to.' Merriam-Webster, https://www.merriam-webster.com/dictionary/abate (accessed May 29, 2018)."); *State, ex rel. Rear Door Bookstore v. Tenth Dist. Ct. of Appeals*, 588 N.E.2d 116 (Ohio 1992) (closure of bookstore found to be a public nuisance was "abatement" of the nuisance). None of these sources suggests an award of monetary damages to "abate" a public nuisance. Monetary damages are a remedy at law, not in equity. *See Cirino v. Ohio Bur. of Workers' Comp.*, 106 N.E.3d 41, 53–54 (Ohio 2018) (O'Donnell, J., dissenting) (distinguishing between "money damages to compensate [one] for losses they suffered or would suffer," and specific equitable relief).

The history of the remedies available to address public nuisances, from Tudor England through to modern-day Ohio, is also instructive. Public nuisance is an ancient legal doctrine dating back to before our nation's founding. Over a century

ago, the United States Supreme Court in *Mugler v. Kansas* recognized this long pedigree:

> "In regard to public nuisances, . . . the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable, not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. * * * In case of public nuisances, properly so called, an indictment lies to abate them, and to punish the offenders. But an information also lies in equity to redress the grievance by way of injunction."

*Mugler v. Kansas*, 123 U.S. 623, 672–73 (1887) (quoting 2 Joseph Story, *Commentaries on Equity Jurisprudence* §§ 921, 922 (1839)).

The *Mugler* Court noted the advantages in a court's exercise of its equity jurisdiction to address public nuisances, particularly the ability of courts sitting in equity "to give a more speedy, effectual, and permanent remedy than can be had at law." *Id.* at 673. The virtues of using equitable remedies to address public nuisances also included the ability to "prevent nuisances that threatened, and before irreparable mischief ensures" but also to "arrest and abate those in progress, and by perpetual injunction, protect the public against them in the future." *Id.*

To be sure, the equitable abatement of public nuisances often results in the responsible party expending funds to comply with the court order. An order requiring a company to take additional steps in disposing of waste into public waters or onto public lands, for example, or preventing the escape of pollutants into the atmosphere will likely incur compliance costs. Likewise, a company ordered to correct its

encroachment on public properties or spaces will incur costs in so doing. But in those cases, the offending party does not pay the government—it simply has to take steps to abate the nuisance—even if it costs money to do so. "There is no historical evidence [] that the state (or its predecessor under English law, the Crown) was ever able to sue for damages to the general public resulting from a public nuisance." Donald G. Gifford, *Pub. Nuisance as a Mass Products Liab. Tort*, 71 U.Cin.L.Rev. 741, 782 (2003). Instead, the government remedies were "restricted to prosecution or abatement, or both." *Id.*

The drafters of the Restatement (Second) of Torts took up the question of who can recover monetary damages for a public nuisance. The Restatement recognizes that only individuals *injured* by a public nuisance may recover monetary damages because they have suffered a harm different in kind from the "harm suffered by other members of the public exercising the right common to the general public that was the subject of the interference." Restatement (Second) of Torts § 821C (Am. Law Inst. 1979). In contrast, a suit to enjoin or abate a public nuisance is available to either a member of the public who has suffered special injury or a public official or public agency representing the state or a political subdivision. *Id.*

This distinction is consistent with the history of public nuisance law. The public nuisance doctrine arose in twelfth-century England as a quasi-criminal action by the Crown. Adam Coretz, Note, *Reparations for A Pub. Nuisance? The Effort to*

*Compensate Survivors, Victims, & Descendants of the Tulsa Race Massacre One Hundred Years Later,* 43 Cardozo L. Rev. 1641, 1649–50 (2022). At that time, the King invoked public nuisance to bring suit against anyone who infringed on the rights of the Crown in order to stop the infringement, and he required the offending party to repair the damage. *Id.* at 1649. Notably, the remedy was the King's alone and tied to the damage done.

But in the fourteenth century, the common law public nuisance claim developed to provide an individual right to obtain particular monetary damages for infringements on rights common to the public.

> In 1535, an English court, for the first time, allowed individuals to sue and recover damages under the doctrine. The case involved the blocking of a highway and set the precedent that an individual who had suffered "particular damages" could file a public nuisance suit to recover those damages.

Victor E. Schwartz & Phil Goldberg, *The Law of Pub. Nuisance: Maintaining Rational Boundaries on A Rational Tort*, 45 Washburn L.J. 541, 544 (2006) (internal citations omitted). But "the individual could not sue for injunction and abatement because those actions were reserved solely for the Crown." *Id.* In other words, as the present-day Restatement continues to recognize, public nuisance law envisions two distinct types of plaintiffs and provides distinct and exclusive remedies for each. Suing to abate a public nuisance has always been quasi-criminal in nature and the prerogative of the government.

American law adopted public nuisance as a "species of catch-all low grade criminal offense." William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997, 999 (1966). The rule remained, however, that while citizens suffering an *individualized* injury could sue for their damages, governments were limited to criminal or equitable remedies. This distinction makes sense considering that the government's purpose in prosecuting and abating the nuisance was to serve the citizenry at large rather than compensate specific citizens for specific harms done to them.

Ohio courts have followed the Restatement, citing Professors Prosser and Keeton, to hold that "[h]istorically, public nuisance was criminal in nature and recovery in damages is limited to those who can show particular harm of a kind different from that suffered by the general public." *Brown v. Scioto Cty. Bd. of Commrs.*, 622 N.E.2d 1153, 1158 (Ohio 4th Dist. 1993).

Ohio's Eighth District Court of Appeals held that in the context of a specific insurance policy, an abatement fund awarded by a California court under a California code provision *constituted damages* and so those "damages" were covered by the insurance policy. *Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*, 2022-Ohio-3031, ¶ 67 (8th Dist.), *appeal allowed,* 208 N.E.3d 859. The California-mandated abatement fund was to "reimburse the government's costs." *Id*. The

14

*Sherwin-Williams* court also cited with approval the following language from the California case:

> An abatement order is an equitable remedy, while damages are a legal remedy. An equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff. An equitable remedy provides no compensation to a plaintiff for prior harm. Damages, on the other hand, are directed at compensating the plaintiff for prior accrued harm that has resulted from the defendant's wrongful conduct. The distinction between these two types of remedies frequently arises in nuisance actions.

*Id.* at ¶ 13 (quoting *People v. ConAgra Grocery Prod. Co.*, 17 Cal.App.5th 51, 131, 227 Cal.Rptr.3d 499 (2017)).

Discussing the different remedies available to government versus private plaintiffs, Professors Schwartz and Golding have echoed the Restatement, noting that "[w]hen government serves as the plaintiff and is suing in its role as the sovereign, only injunction or abatement remedies are appropriate." Schwartz et al., *supra*, at 570. According to Schwartz and Golding, the rationale for this rule—beyond the distinction's long history—is twofold. First, allowing governments to collect monetary damages for a public nuisance is inappropriate because "[e]ven when it acts in the name of public health, the state is not the party who has suffered the special damages being sought." *Id*. (quoting Gifford, *supra*, at 784–785). Second, "the free public services doctrine," which prohibits a government entity from assessing the costs associated with the performance of governmental functions to a few disfavored tortfeasors, rather than the public at large, bars the remedy that the

trial court seeks to impose. *Id.* In other words, costs that the government would ordinarily incur to abate some societal ill—in this case, funding crime prevention, court costs, and related activities—must "be borne by the public as a whole and cannot be assessed against an individual tortfeasor." *Id.* Ohio courts have long hewed to the distinction between legal and equitable remedies and recognized that a court acting in equity lacks the authority to order monetary damages.

The distinction between legal claims—seeking monetary damages—versus equitable claims—seeking equitable remedies—is further emphasized when examining the right to a jury trial. In *State ex rel. Miller v. Anthony*, 647 N.E.2d 1368 (Ohio 1995), the Franklin County Prosecuting Attorney brought a public nuisance abatement action against Anthony, a drug dealer, pursuant to R.C. 3719.10, which declares properties on which felony drug offenses occur to be public nuisances. As part of the abatement, the county sought, and the court authorized, a permanent injunction enjoining Anthony from maintaining the nuisance on his current, or any other property. *Id.* at 138. Anthony objected that he had been denied a jury trial in violation of Section 5, Article I of the Ohio Constitution. *Miller* held that because the abatement order was designed to prevent the continued nuisance (i.e. drug dealing) it was a purely equitable action and Anthony was therefore not entitled to a jury.

The *Miller* court began by noting the distinction between an equitable

abatement action and a common law suit, noting that "[a]s early as 1893, the United States Supreme Court defined an abatement action as 'not a common law action, but a summary proceeding more in the nature of a suit in equity * * *.'" *Id.* at 136 (citing *Cameron v. United States*, 148 U.S. 301, 304 (1893)). The Ohio Supreme Court was clear that the nature of the relief sought—injunctive versus legal—determines in part the process afforded. Because "[n]uisance abatement actions seek injunctive relief and, as such, are governed by the same equitable principles that apply to injunctive actions generally," a "[jury] trial is not required." *Id.* (quoting *Parker v. Winnipiseogee Lake Cotton & Woolen Co.*, 67 U.S. 545, 551 (1863); *Mugler*, 123 U.S. at 673). The court explained that the state has the authority to move quickly to abate a public nuisance without the process required by a jury trial. But that ability to act quickly and fashion a flexible equitable remedy comes with a price: The remedy must be "designed to prevent the continuation of unlawful acts rather than [as] a punishment for unlawful activity." *Id.* at 138.

Likewise, Ohio law is clear that "[a] public nuisance provides a basis for recovery of damages by individual plaintiffs only where the injury suffered is a 'particular harm * * * that is of a different kind than that suffered by the public in general.'" *Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 52 (Ohio 6th Dist.) (quoting *Brown*, 622 N.E.2d at 1160). Moreover, it is unclear how the damages allegedly suffered by the plaintiffs—local government entities—are any different

than those suffered by the public in general. Indeed, local governments represent the "public in general." To the extent that those governments claim to have suffered economic losses by the costs they have incurred and will incur in dealing with the car theft crime wave, those economic losses are economic losses to the public at large.

### III. The 1998 tobacco settlement shows how governments redirect funds designated for curing a particular social ill.

Plaintiffs seek massive monetary recovery to supposedly fund police and other governmental activities. But such funding via tort litigation rather than taxation is neither legally viable nor is it likely to do what Plaintiffs claim it will do. Not only are courts guided by precedents and legal theory, but they are also guided by experience in the application of the law and equity. Indeed, if we do not learn from our mistakes of the past, we are likely to repeat them.[8]

Ohio's experience with the 1998 settlement between major tobacco companies and 46 states provides a cautionary tale in awarding monetary damages in the hope of remediating a community-wide problem—like car thefts. In the 1998 tobacco settlement, state governments received $246 billion to restrict cigarette sales and marketing by forbidding manufacturers from targeting youth and banning specific

---

[8] "Those who cannot remember history are condemned to repeat it." 1 George Santayana, *The Life of Reason* (1905). This aphorism holds special meaning for the practice of law . . . ." *Postal Instant Press v. Jackson*, 658 F. Supp. 739, 747–48 (D.Colo. 1987).

types of media (e.g., cartoons). The settlement funds were also to be used for prevention and cessation programs.[9] Michele Gilbert, *What History's Big Tobacco Settlement Means for Today's 'Opiod Remediation'*, Bipartisan Policy Center (Aug. 19, 2021).[10] A retrospective assessment conducted 20 years after the settlement by an anti-tobacco advocacy coalition, however, showed that "less than 3% of the settlement funds were used for programs to prevent kids from smoking and to help smokers quit." *Broken Promises to Our Children*, Campaign for Tobacco Free Kids.[11] Because money is always fungible, there is no guarantee that payments earmarked for addressing particular problems will arrive at their intended destination. Politicians can display an almost child-like imagination in re-purposing, re-classifying, and re-labeling programs in order to qualify them for otherwise earmarked money.

---

[9] Notably, the tobacco companies undoubtedly signed the Tobacco Master Settlement Agreement, at least in part, because they knew they could recover any settlement funds paid out with price increases with their addictive product—and they did. "Cigarette prices surged 45 cents per pack on November 16, 1998, the day the Master Settlement Agreement (MSA) was signed. Cigarette manufacturers raised prices to cover the cost of the settlement." Thomas C. Capehart, *Trends in the Cigarette Industry After the Master Settlement Agreement*, U.S Dept. of Agriculture (2001), www.ers.usda.gov/webdocs/outlooks/39455/31534_tbs250-01_002.pdf?v=7312.4. If the plaintiffs' recovery theory succeeds, the automobile manufacturer defendants will likely just increase their prices to pay the damages award.

[10] https://bipartisanpolicy.org/blog/big-tobacco-opioids/.

[11] https://www.tobaccofreekids.org/what-we-do/us/statereport (las visited Sept. 4, 2024).

Ohio's own use of tobacco settlement proceeds stands as an example of the insecurity of special set-asides. Following the settlement, the State began by taking prudent steps to evaluate how it would spend the initial $330 million payment. In 1999, Governor Bob Taft and the General Assembly created the Tobacco Settlement Task Force in Ohio to develop spending recommendations. The task force conducted a series of public meetings and deliberations and reviewed research and analysis before presenting its recommendations. *See* Ken Slenkovich, *Ohio's Tobacco Master Settlement Agreement: History, Lessons Learned and Considerations for Ohio*, The Center for Community Solutions.[12] The Task Force based its recommendations on the U.S. Centers for Disease Control and Prevention's *Best Practices for Comprehensive Tobacco Control Programs*, "a guide for states that summarized the best available information at the time regarding programs shown to be effective in reducing tobacco use." *Id.*

In 2000, largely following the Task Force's recommendations, the legislature enacted S.B. 192, which stipulated how funds from the settlement would be distributed and used in the state. The legislation "specified that all MSA funds would be deposited into the state treasury to the Master Settlement Agreement Fund (MSA Fund). It also created eight funds in the treasury into which money would be transferred from the MSA Fund." *Id.* The bill included language requiring at least

---

[12] https://tinyurl.com/3bzm6jea (last visited Sept. 4, 2024).

some of the money from three of the funds to be used for activities tied to tobacco-related concerns and specifically created an endowment to fund programs to reduce Ohioans tobacco use, focusing on "youth, minority and regional populations, pregnant women, and others disproportionately affected by tobacco use." *Id.*

This seemed like a solid and responsible plan to ensure that the settlement funds were spent for their intended purpose—preventing tobacco use. But as onetime Ohio resident Mike Tyson observed, "[e]veryone has a plan until they get punched in the mouth." Mike Berardino, *Mike Tyson explains one of his most famous quotes*, South Florida Sun-Sentinel.[13] The punch in the mouth came in the form of the 2008–2009 Great Recession. Ohio's employment rate rose to 10.3% and the state found more pressing needs for the tobacco settlement funds. Slenkovich, *supra*. The legislature diverted *all* of the existing funds from Tobacco Use Prevention and Cessation Trust Fund ("TUPCF") to "a job-creation fund." *Id.* When the TUPCF'S board "took action to prevent the diversion, the state abolished the foundation" and absorbed all of the TUPCF's funds into the state's general revenue fund. The General Assembly later authorized the State Treasurer to securitize the right to future payments and sell capital appreciation bonds backed by future settlement payments. In essence, "the state sold its rights to future [settlement] payments in exchange for a lump sum." *Id*. Thus, the funds placed in trust for the specific purpose of funding

---

[13] https://tinyurl.com/hmtzn2f8 (last visited Sept. 4, 2024).

smoking cessation and prevention were converted into monetary damages. As a result, "virtually overnight, Ohio went from having one of the best-funded tobacco control programs to one of the worst-funded." Micah L. Berman, *Using Opioid Settlement Proceeds for Public Health: Lessons from the Tobacco Experience*, 67 U. Kan. L. Rev. 1029, 1042 (2019). Ohio "is emblematic of what happened in a number of other states. . . . Ultimately, in nearly every state, the plan to make long-term, sustained investments in tobacco control was not realized and successful tobacco control programs were dismantled—often as the result of budgetary pressures." *Id.*

Ohio's Tobacco Master Settlement misadventure is instructive as to why misapplying public nuisance abatement to compensatory damages is an illegitimate legal theory. The longstanding distinction between equitable relief and monetary damages reflects our constitutional separation of powers. Legislatures have the authority to raise taxes and direct the expenditure of those funds. Courts—which are by design less responsive to the political winds—properly lack the power to raise money for the public fisc.

## CONCLUSION

Ohio law does not condone or permit the claims Plaintiffs assert.

Respectfully submitted,

_/s/ David C. Tryon_
David C. Tryon
  *Counsel of Record*
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

## CERTIFICATE OF COMPLIANCE

Federal Rules of Appellate Procedure Appendix 6 1.

1. This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,260 words.

2. This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman.

　*/s/ David C. Tryon*　
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing amicus brief was served on all counsel of record via the Court's electronic filing system this 4th day of September 2024.

Respectfully submitted,

*/s/ David C. Tryon*
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*