**No. 24-2350**

IN THE

# United States Court Of Appeals

### FOR THE NINTH CIRCUIT

◆━◆

City of Cincinnati; City of Cleveland; City of Seattle; City of Rochester, City of Yonkers; City of Green Bay; Town of Tonawanda; City of Columbus; City of Kansas City; City of Indianapolis; City of Buffalo; City of Madison; City of Milwaukee; City of New York; City of Parma; City of St. Louis; City of Baltimore,

*Plaintiffs-Appellees,*

v.

Hyundai Motor America, Inc.; Kia Motor America, Inc.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Central District of California
8:22-ml-03052-JVS-KES
Honorable James V. Selna, District Judge

**ANSWERING BRIEF OF PLAINTIFFS-APPELLEES**

KELLER ROHRBACK L.L.P.
Gretchen Freeman Cappio
Benjamin Gould
Ryan McDevitt
Garrett Heilman
1201 THIRD AVENUE, SUITE 3400
SEATTLE, WA 98101-3268
TEL: (206) 623-1900
*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

INTRODUCTION...................................................................... 1

JURISDICTIONAL STATEMENT ........................................ 3

STATEMENT OF THE ISSUES.............................................. 3

STATEMENT OF THE CASE ................................................ 4

I.    Because the risks and costs of car theft have been clear for as long as the consumer automobile has existed, auto manufacturers have developed effective ways to deter theft.................................. 4

II.    Defendants chose not to install immobilizers or any other reasonable anti-theft technology, resulting in a wave of theft of their vehicles. ....................... 7

III.    The district court upholds the Municipalities' claims against Defendants................................... 12

SUMMARY OF ARGUMENT .............................................. 14

ARGUMENT ....................................................................... 19

I.    Defendants owed the Municipalities a duty of care. ..................................................................... 19

A.    The doctrine that there is generally no duty to control the actions of third parties does not apply to an item like anti-theft technology, whose very purpose is deterring third-party misconduct. ........................... 20

B.    A duty of care exists under Wisconsin law............... 23

1.    Under Wisconsin law, there is a general duty of care that applies to Defendants' activities here. .............................. 23

2. Defendants do not even attempt an argument that Wisconsin's traditional public-policy considerations bar liability here. .................................... 29

C. A duty of care exists under New York law. .............. 30

D. A duty of care exists under Ohio law......................... 33

II. The Court should decline Defendants' invitation to ignore the scope of the district court's certification........................................................... 36

III. The federal regulation governing anti-theft devices does not preempt the Municipalities' claims................................................................... 40

IV. A duty of care exists under Missouri law. .......................... 48

V. The Municipalities have stated public nuisance claims................................................................... 53

A. Under Wisconsin law, the concept of duty has never been applied to public nuisance claims................................................................... 53

B. Under New York law, public nuisance claims are independent of negligence duties............. 55

C. Under Missouri law, public nuisance claims are independent of negligence duties. ....................... 60

CONCLUSION .................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.E. Inv. Corp. v. Link Builders,*
    214 N.W.2d 764 (Wis. 1974) ............................................................ 29

*Alvarado v. Sersch,*
    662 N.W.2d 350 (Wis. 2003) ..................................................... *passim*

*Baker v. Empire District Electric Co.,*
    24 S.W.3d 255 (Mo. Ct. App. 2000).................................................... 61

*Beaver v. Tarsadia Hotels,*
    816 F.3d 1170 (9th Cir. 2016)...................................................... 37, 38

*Becker v. Cardinal Health, Inc.,*
    179 N.E.3d 769 (Ohio Ct. App. 2021) ............................................... 35

*Bluetooth SIG Inc. v. FCA US LLC,*
    30 F.4th 870 (9th Cir. 2022) ........................................................... 37

*Bowen v. Lumbermens Mut. Cas. Co.,*
    517 N.W.2d 432 (1994) ................................................................... 23

*Aziz ex rel. Brown v. Jack in the Box, E. Div., LP,*
    477 S.W.3d 98 (Mo. Ct. App. 2015).................................................. 50

*Butler v. Advanced Drainage Sys., Inc.,*
    717 N.W.2d 760 (Wis. 2006) ............................................................ 54

*Cincinnati v. Beretta U.S.A. Corp.,*
    768 N.E.2d 1136 (Ohio 2002).......................................... 16, 33, 34, 35

*Estate of Ciotto v. Hinkle,*
    145 N.E.3d 1013 (Ohio Ct. App. 2019) .............................................. 36

*City of New York v. A-1 Jewelry & Pawn, Inc.,*
    247 F.R.D. 296 (E.D.N.Y. 2007)................................................... 56, 58

*City of Rochester v. Premises Located at 10-12 S. Washington St.*,
    687 N.Y.S.2d 523 (Sup. Ct. 1998) ................................................. 56, 59

*Cohen v. ConAgra Brands, Inc.*,
    16 F.4th 1283 (9th Cir. 2021) ........................................................... 43

*Copart Indus., Inc. v. Consol. Edison Co. of N.Y., Inc.*,
    362 N.E.2d 968 (N.Y. 1977) ............................................................. 57

*Cromer v. Children's Hosp. Med. Ctr. of Akron*,
    29 N.E.3d 921 (Ohio 2015) ................................................................ 33

*Davis v. J.C. Nichols Co.*,
    714 S.W.2d 679 (Mo. Ct. App. 1986) ................................................. 60

*Dix v. Motor Mkt., Inc.*,
    540 S.W.2d 927 (Mo. Ct. App. 1976) ........................................... 22, 52

*Epstein v. Mediterranean Motors, Inc.*,
    491 N.Y.S.2d 391 (App. Div. 1985) ................................................... 22

*FDIC v. Dye*,
    642 F.2d 833 (5th Cir. Unit B Apr. 1981) ......................................... 38

*Fischer v. Cleveland Punch & Shear Works Co.*,
    280 N.W.2d 280 (Wis. 1979) ............................................................. 28

*Frank v. Envt'l Sanitation Mgmt.*,
    687 S.W.2d 876 (Mo. 1985) .............................................................. 60

*Geier v. America Honda Motor Co.*,
    529 U.S. 861 (2000) ......................................................... 17, 40, 41, 44

*Hamilton v. Beretta U.S.A. Corp.*,
    750 N.E.2d 1055 (N.Y. 2001) ....................................................... 33, 57

*Hanna v. St. Lawrence County*,
    825 N.Y.S.2d 798 (App. Div. 2006) ................................................... 32

*He v. Apple, Inc.*,
    139 N.Y.S.3d 409 (App. Div. 2020) ................................................... 32

iv

*Faheen ex rel. Hebron v. City Parking Corp.*,
    734 S.W.2d 270 (Mo. Ct. App. 1987) .................................................. 50

*Hofflander v. St. Catherine's Hospital, Inc.*,
    664 N.W.2d 545 (Wis. 2003) ....................................................... 26, 27

*Hoida, Inc. v. M & I Midstate Bank*,
    717 N.W.2d 17 (Wis. 2006) ......................................................... 25, 26

*Homeland Stores, Inc. v. Resolution Tr. Corp.*
    17 F.3d 1269 (10th Cir. 1994) ............................................................. 38

*Hornback v. Archdiocese of Milwaukee*,
    752 N.W.2d 862 (Wis. 2008) ....................................................... 25, 26

*House v. Armour of America, Inc.*,
    929 P.2d 340 (Utah 1996) .................................................................. 21

*Ingram v. Wayne Cnty.*,
    81 F.4th 603 (6th Cir. 2023), *abrogated on other grounds*
    *by Culley v. Marshall*, 601 U.S. 377 (2024) ...................................... 38

*Irby v. St. Louis Cnty. Cab Co.*,
    560 S.W.2d 392 (Mo. Ct. App. 1977) ................................................ 52

*Jackson v. City of Blue Springs*,
    904 S.W.2d 322 (Mo. Ct. App. 1995) ........................................... 61, 62

*Jankee v. Clark County*,
    612 N.W.2d 297 (Wis. 2000) ....................................................... 26, 27

*Johnson v. City of Shelby*,
    574 U.S. 10 (2014) (per curiam) ........................................................ 48

*Jonathan A. v. Board of Education*,
    779 N.Y.S.2d 3 (App. Div. 2004) ....................................................... 32

*Klepper v. Seymour House Corp. of Ogdensburg*,
    158 N.E. 29 (N.Y. 1927) ................................................................... 55

*Kuehner v. Dickinson & Co.*,
    84 F.3d 316 (9th Cir. 1996) .............................................................. 39

*Kuhn v. Budget Rent-A-Car of Missouri, Inc.*,
876 S.W.2d 668, 673–74 (Mo. Ct. App. 1994) ...................................... 51

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) ................................................................ 47

*Landon v. Kroll Lab. Specialists, Inc.*,
999 N.E.2d 1121 (N.Y. 2013) .............................................................. 31

*Lavo v. Medlin*,
705 S.W.2d 562 (Mo. Ct. App. 1986) .................................................. 52

*Lawton v. Hyundai Motor America, Inc.*,
No. 24-00097-CV-W-BP, 2024 WL 2318623 (W.D. Mo.
May 20, 2024) ....................................................................................... 53

*Linegar v. Armour of Am., Inc.*,
909 F.2d 1150 (8th Cir. 1990) ...................................................... 21, 49

*Little v. Louisville Gas & Elec. Co.*,
805 F.3d 695 (6th Cir. 2015) ............................................................... 38

*Lowrey v. Horvath*,
689 S.W.2d 625 (Mo. 1985) ................................................................ 48

*Madden v. C&K Barbecue Carryout, Inc.*,
758 S.W.2d 59 (Mo. 1988) .................................................................. 50

*McCarthy v. Olin Corp.*,
119 F.3d 148 (2d Cir. 1997) ................................................................ 33

*McFarlane v. City of Niagara Falls*,
160 N.E. 391 (N.Y. 1928) .................................................................... 55

*Milwaukee Metropolitan Sewerage District v. City of
Milwaukee*,
691 N.W.2d 658 (Wis. 2005) ......................................................... 54, 55

*Moroney v. General Motors Corp.*,
850 A.2d 629 (Pa. Super. Ct. 2004) .................................................... 21

*Murphy v. Both*,
922 N.Y.S.2d 483 (App. Div. 2011) ....................................59

*Murphy v. Columbus McKinnon Corp.*,
982 N.W.2d 898 (Wis. 2022) ...........................................28

*N.A.A.C.P. v. AcuSport, Inc.*,
271 F. Supp. 2d 435 (E.D.N.Y. 2003)............................58, 60

*In re Nassau Cnty. Consol. MTBE (Methyl Tertiary Butyl Ether) Prod. Liab. Litig.*,
No. 601516/2009, 2010 WL 4400075 (N.Y. Sup. Ct. Nov. 4, 2010)..............................................................56, 60

*New York v. Shore Realty Corp.*,
759 F.2d 1032 (2d Cir. 1985) ....................................43, 56

*Nicholson v. CPC Int'l Inc.*,
877 F.2d 221 (3d Cir. 1989), *abrogated on other grounds by Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)..................................................................39

*O'Hara v. Gen. Motors Corp.*,
508 F.3d 753 (5th Cir. 2007)............................................45

*Palka v. Servicemaster Mgmt. Servs. Corp.*,
634 N.E.2d 189 (N.Y. 1994) ............................................30

*Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*,
646 N.W.2d 777 (Wis. 2002) ...........................................55

*Pirani v. Slack Techs., Inc.*,
13 F.4th 940 (9th Cir. 2021), *vacated and remanded on other grounds*, 598 U.S. 759 (2023) ...................................37

*Bradley ex rel. Pope v. Ray*,
904 S.W.2d 302, 310–12 (Mo. Ct. App. 1995)....................51

*Reese v. BP Exploration (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011)............................................37

vii

*Richards v. Stanley*,
    271 P.2d 23 (Cal. 1954) ...................................................... 22

*Richardson v. QuikTrip Corp.*,
    81 S.W.3d 54 (Mo. Ct. App. 2002) ..................................... 50

*Rollins v. Dignity Health*,
    830 F.3d 900 (9th Cir. 2016), *rev'd on other grounds sub
    nom. Advocate Health Care Network v. Stapleton*, 581
    U.S. 468 (2017) .................................................................. 37

*Roth v. City of St. Joseph*,
    147 S.W. 490 (Mo. Ct. App. 1912) ...................................... 61

*Scheibel v. Hillis*,
    531 S.W.2d 285 (Mo. 1976) ................................................ 50

*Scott v. City of Marshall*,
    14 S.W.2d 694 (Mo. Ct. App. 1929) ................................... 60

*Shaw's Jewelry Shop v. N.Y. Herald Co.*,
    156 N.Y.S. 651 (App. Div. 1915) ....................................... 58

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .............................................. 37

*Sperling v. Hoffman-La Roche Inc.*,
    862 F.2d 439 (3d Cir. 1988), *aff'd and remanded*, 493 U.S.
    165 (1989) .......................................................................... 40

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
    761 N.Y.S.2d 192 (App. Div. 2003) ............................... 59, 60

*Stevens & Thompson Paper Co. v. Middle Falls Fire
    Department*,
    137 N.Y.S.3d 529 (App. Div. 2020) ................................... 59

*SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*,
    No. 20-cv-10731 (LJL), 2023 WL 2601161 (S.D.N.Y. Mar.
    22, 2023) ............................................................................ 58

*Sunlight Clinton Realty, LLC v. Gowanus Industrial Park, Inc.*,
86 N.Y.S.3d 617 (App. Div. 2018) ........................................... 59

*Swanson v. Bradshaw*,
187 S.W. 268 (Mo. Ct. App. 1916) ........................................... 61

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ................................................... 40

*United States v. Gomez*,
6 F.4th 992 (9th Cir. 2021) ..................................................... 29

*Vittengl v. Fox*,
967 S.W.2d 269 (Mo. Ct. App. 1998) ..................................... 52

*Wilkins v. Hendel*,
654 S.W.3d 429 (Mo. Ct. App. 2022) ..................................... 62

*Williamson v. Mazda Motor of America Inc.*,
562 U.S. 323 (2011) ..................................... 17, 40, 41, 42

## Statutes

28 U.S.C. § 1292(b) .......................................................... *passim*

28 U.S.C. § 1407 .................................................................. 12

49 U.S.C. § 30103(e) ............................................................ 40

National Motor Vehicle Theft Act, Pub. L. No. 66-70, 41 Stat. 324 (1919) ....................................................................... 4

National Traffic and Motor Vehicle Safety Act, Pub. L. 89-563, 80 Stat. 718 (1966) ..................................................... 6, 7

Wis. Stat. § 893.80(4) ........................................................... 54

## Other Authorities

Charles Dickens, *Oliver Twist* (1838) ....................................... 9

Fed. R. Civ. P. 8(d)(2) ........................................................... 47

Fed. R. Civ. P. 8(d)(3) ............................................................... 47

Fed. R. Civ. P. 12(b)(6) ............................................................. 13

Federal Motor Vehicle Safety Standards; Theft Protection,
 71 Fed. Reg. 17752 (Apr. 7, 2006) ................................ 45, 46

FMVSS 114; Theft Protection, 55 Fed. Reg. 21868 (May 30,
 1990) ....................................................................................... 44

Initial Federal Motor Vehicle Safety Standards, 33 Fed. Reg.
 6471 (Apr. 26, 1968) ............................................................. 43

Matt Posky, *Summer of Theft Creating Bad Publicity for
 Hyundai, Kia,* Truth About Cars (Sept. 20, 2022 2:36 PM) ............... 8

President's Comm. on Law Enforcement and Admin. of
 Justice, *The Challenge of Crime in a Free Society* (Feb.
 1967) ......................................................................................... 5

*Restatement (Second) of Torts* (1965) ..................................... 61

Simon Field, *Crime Prevention and the Costs of Auto Theft:
 An Economic Analysis,* in 1 Crime Prevention Studies 69
 (Ronald V. Clarke ed., 1993) ................................................. 5

## INTRODUCTION

In most of the vehicles they have distributed in America, Defendants Hyundai Motor America and Kia America, Inc. installed anti-theft equipment that can be circumvented with nothing more than a screwdriver and a USB cable. This decision to install inadequate anti-theft equipment slightly lowered Defendants' costs. It also led to a wave of vehicle theft that has overwhelmed local governments' budgets, consumed law enforcement's time and resources, and endangered first responders.

In the litigation from which this interlocutory appeal arises, local governments from across the country have asked that Defendants bear the predictable downstream costs of their business decision. This appeal concerns the negligence claims of local governments from Wisconsin, New York, and Ohio (the "Municipalities"). These negligence claims, according to Defendants, seek to impose liability for failure to prevent the criminal activity of third parties—and, say Defendants, there is no such liability in the absence of a "special relationship."

This argument fails on several different levels. For one thing, it misapplies the case law of Wisconsin, New York, and Ohio in crucial ways. *See infra* Argument § I.B–D.

Perhaps most fundamentally, however, it fails to recognize that the Municipalities seek to hold Defendants liable for negligence in their design, manufacture, and distribution of anti-theft equipment— equipment whose very purpose is to protect against third-party criminal activity. Whenever a defendant negligently designs, manufactures, or distributes such equipment, and the equipment fails to serve its purpose, it is precisely criminal activity that will result. If a defendant were able to point to that activity to immunize itself against liability, no one that designed or distributed equipment meant to protect against criminals—from locks to safes to bulletproof glass—could ever be held liable for negligence. Unsurprisingly, then, Defendants have pointed to no appellate court, state or federal, that has applied their "third party" rule to a case like this.

Defendants also seek to dramatically expand this appeal beyond the negligence claims that were the subject of the district court's certification under 28 U.S.C. § 1292(b). This is a jurisdictionally

dubious tactic, and even if it were not, there are compelling reasons of judicial efficiency and administration to follow this Court's usual practice and decline Defendants' invitation to address unrelated legal issues.

## JURISDICTIONAL STATEMENT

Under 28 U.S.C. § 1292(b), the Court has jurisdiction over the Wisconsin, New York, and Ohio negligence claims asserted in this action. As explained below, jurisdiction to reach other claims is lacking. *See infra* Argument § II.

## STATEMENT OF THE ISSUES

1.      The Municipalities allege that when Defendants included anti-theft equipment in their vehicles, they failed to exercise reasonable care in its design and installation, thereby forcing the Municipalities to deal with the ensuing wave of car theft. Under Wisconsin, New York, and Ohio law, did Defendants owe the Municipalities a duty of care in the design and installation of their vehicles' anti-theft equipment?

2.      The district court's order of certification under 28 U.S.C. § 1292(b) certified only the Wisconsin, New York, and Ohio negligence claims for appeal. To what extent can and should the Court address other issues in this appeal?

3

3.     If the Court decides that it should address preemption in this appeal, was the district court right to hold that the Municipalities' claims are not impliedly preempted by a federal regulation on anti-theft equipment?

4.     If the Court decides it can and should address the Missouri negligence claim, did Defendants owe the Missouri Municipalities a duty of care under Missouri law in the design and installation of their vehicles' anti-theft equipment?

5.     If the Court decides it can and should address public nuisance claims under Wisconsin, New York, and Missouri law, do such claims fail absent a negligence-based duty of care?

## STATEMENT OF THE CASE

I.     **Because the risks and costs of car theft have been clear for as long as the consumer automobile has existed, auto manufacturers have developed effective ways to deter theft.**

For nearly as long as motor vehicles have been a widely used consumer good, there have been devices to deter their theft. In 1919, the first electric anti-theft device was patented for motor vehicles. *See* 3-ER-316, ¶¶ 58–60. That same year, Congress responded to the growing number of auto thefts by passing the National Motor Vehicle Theft Act,

4

Pub. L. No. 66-70, 41 Stat. 324 (1919), which made it a federal crime to move stolen vehicles across state lines. 3-ER-317, ¶ 61.

After World War II, an increase in car theft among juveniles and young adults prompted further government action. *See* 3-ER-317, ¶ 62. In 1967, a presidential commission on crime called for action to make it harder to steal vehicles. Auto theft, the commission observed, was extremely costly for the criminal justice system. *See* President's Comm. on Law Enforcement and Admin. of Justice, *The Challenge of Crime in a Free Society* 260 (Feb. 1967). Auto thefts were also "primarily juvenile acts," with persons under 18 making up 63% of arrests for auto theft. *Id.* Many of these young car thieves were "incompetent drivers and frequently damage[d] the vehicle or injure[d] themselves or others." *Id.* The commission recommended that "some Federal agency . . . establish minimum requirements" for anti-theft devices.[1] *Id.* at 261.

---

[1] Regulation of anti-theft devices is necessary, economists have suggested, because most of the cost of car theft does not fall on car buyers and instead falls on governments, among others. Car buyers' market demand alone, therefore, cannot provide a socially optimal level of anti-theft protection. *See* Simon Field, *Crime Prevention and the Costs of Auto Theft: An Economic Analysis*, in 1 Crime Prevention Studies 69, 86 (Ronald V. Clarke ed., 1993).

Shortly after the commission's report, the National Highway Traffic Safety Administration (NHTSA) exercised its authority under the newly enacted National Traffic and Motor Vehicle Safety Act ("Act"), Pub. L. 89-563, 80 Stat. 718 (1966), to promulgate minimum theft-protection standards for passenger vehicles. 3-ER-318, ¶¶ 63–64. In promulgating the standard—Federal Motor Vehicle Safety Standard (FMVSS) 114—the agency recognized "that stolen cars constitute a major hazard to life and limb on the highways." 3-ER-319, ¶ 65; *see also* 3-ER-319, ¶ 66.

After FMVSS 114 came into effect, the rate of auto theft decreased through the 1970s and early 1980s, only to increase sharply beginning in the mid-1980s. *See* 3-ER-320, ¶ 68. During this period, the most common method for stealing a car was "hotwiring": bypassing the motor's ignition switch so that the car could be started without a key. *Id.*

Then came the electronic engine immobilizer ("immobilizer"). This device worked by checking the "fingerprint" of a car key based on electronic codes the key would transmit to the vehicle. 3-ER-321, ¶ 70. Immobilizers prevented hotwiring by ensuring that a car would not

6

start if the key was absent—even if thieves were able to bypass the ignition switch. *Id.*

Immobilizers proved remarkably successful, especially at deterring youthful would-be offenders. 3-ER-322, ¶ 75. The rate of car theft declined dramatically from 1996 to 2013. *See* 3-ER-320, 3-ER-322–23, ¶¶ 68, 76. By 2011, one study could describe good-quality immobilizers as "car theft's killer technology." 3-ER-322, ¶ 74.

The success of immobilizers led to their adoption as the industry standard. 3-ER-321, ¶ 73. In 2015, immobilizers were included in 96% of that year's models sold in the United States—*not counting the models produced by Defendants.* 3-ER-323, ¶ 77. The overwhelming majority of the models that Defendants had designed for that year *lacked* immobilizers. *Id.*

## II. Defendants chose not to install immobilizers or any other reasonable anti-theft technology, resulting in a wave of theft of their vehicles.

Defendants have long been familiar with the benefits of industry-standard anti-theft technology. *See* 3-ER-323–24, ¶ 79. In fact, they installed that technology in all the vehicles they sold in Canada and Europe, as well as in higher-end models sold here. 3-ER-303, 3-ER-323–

7

24, ¶¶ 6, 79. But they did not install that technology, or any other reasonable anti-theft technology, in most of their vehicles from 2011 to 2022. *See* 3-ER-324–25, 3-ER-407, 3-ER-418, 3-ER-436–37, ¶¶ 82, 288, 357, 481.

As a result, theft of Defendants' vehicles began to increase, relative to other models, as early as 2015. 3-ER-325, ¶ 83. It continued to increase until 2020, when it skyrocketed late that year. 3-ER-325, ¶¶ 83–84. That was when a group of teenagers, the "Kia Boyz," began posting videos showing how easy it was to steal most of Defendants' vehicles. 3-ER-325–26, ¶ 84. The technique was simple: after breaking in, the thief would remove the plastic cowl under the steering column and use a USB connector to turn the ignition switch and start the car.[2] *Id.* Oftentimes, thieves can do this to Defendants' vehicles in less than a minute. *Id.*

---

[2] The USB connector is not used in any technical way, but simply because it physically fits the ignition switch. *See* Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia,* Truth About Cars (Sept. 20, 2022 2:36 PM), https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971 [https://perma.cc/BPR5-XCTY] (the USB connector is "shov[ed] . . . into [the] cracked-open ignition") (cited at 3-ER-326).

Although Defendants try to blame social media for these thefts, calling the phenomenon "an unprecedented criminal craze," Appellants' Opening Brief ("OB") 5, the social spread of criminal techniques is nothing new. Criminals have shared the tricks of the trade with each other for time immemorial.[3] The internet has merely accelerated the pace of that process, just as it has accelerated much else.

The surge in theft of Hyundai and Kia vehicles began in Milwaukee, but then expanded to other cities. 3-ER-336, ¶ 113. Thefts of Kias and Hyundais in Milwaukee rose from a bit less than 1,000 in 2020 to nearly 7,000 in 2021. 3-ER-337, ¶ 113. In 2022 and the first five months of 2023, thefts of Kias and Hyundais accounted for over 50% of all car thefts in Milwaukee. 3-ER-338, ¶ 118.

Beginning at different times over the past few years, all the other Municipalities have also experienced startling increases in Kia and Hyundai theft. In Cincinnati, for example, theft of Kias and Hyundais more than quadrupled from 2021 to 2022, but slightly decreased for all other vehicle makes. 3-ER-362, ¶ 163. During the first six months of

---

[3] See, for example, Charles Dickens, *Oliver Twist* 143–44, 146–47, 149–53 (1838), which was authored by a journalist acquainted with street crime, though not with TikTok.

2023 in New York City, thefts of Kias and Hyundais was nearly seven times higher than during the same period in 2022. 3-ER-391, ¶ 239. In Madison, Kia and Hyundai thefts almost tripled from 2019 to 2022. 3-ER-344, ¶ 127; *see also* 3-ER-347, ¶¶ 132–133 (Green Bay); 3-ER-355–56, ¶ 149 (Columbus); 3-ER-357–58, ¶¶ 153–156 (Cleveland); 3-ER-369–70, ¶¶ 174–176 (Parma); 3-ER-384–85, ¶¶ 225–26 (Buffalo); 3-ER-387, ¶¶ 229–230 (Rochester); 3-ER-396–97, ¶¶ 249–50 (Yonkers); 3-ER-398–99, ¶ 253 (Tonawanda).

Juveniles stealing Hyundais and Kias in the Municipalities have damaged property and killed and injured bystanders and other drivers. 3-ER-339–42, 3-ER-346, 3-ER-349–54, 3-ER-359–61, 3-ER-365–67, 3-ER-371–73, 3-ER-386, 3-ER-389–90, ¶¶ 119–123, 130, 139–141, 143, 158–159, 161, 168–169, 181–184, 227–228, 236–237. These incidents have been many and varied. In Madison, four juveniles ranging from 12 to 14 years old stole a Kia and crashed it into a parked car, causing the Kia to flip over. 3-ER-346, ¶ 130. The driver of a stolen Kia in Columbus struck and killed a four-year-old while driving recklessly. 3-ER-354, ¶ 145. In Parma, a seventeen-year-old in a stolen Hyundai led Parma police on a high-speed pursuit, reaching speeds of over 80 miles an hour

before crashing through the side of a house; the driver sustained head injuries. 3-ER-371–72, ¶ 183. And in Rochester, a stolen Kia SUV was driven over a high school's grounds, "sending kids screaming and running away in fear." 3-ER-388, ¶¶ 234–235.

This crime wave has hijacked the Municipalities' budgets, causing increased expenditure on law enforcement, emergency services, corrections, and more. 3-ER-405, 3-ER-408, 3-ER-412, 3-ER-415, 3-ER-419, 3-ER-434, 3-ER-437–38, ¶¶ 279, 295, 322, 340, 364, 468, 488. It has also consumed a great deal of police officers' time. *E.g.*, 3-ER-346, 3-ER-348, 3-ER-364, 3-ER-387, 3-ER-397–98, 3-ER-400, ¶¶ 129, 134, 165, 231, 251, 256. As just one example, Columbus police spent about 550 hours in 2020 responding to incidents of stolen Kias and Hyundais, but 4,500 hours in 2022. 3-ER-356, ¶ 151. Numerous police officers have also been injured responding to Kia and Hyundai thefts. *E.g.*, 3-ER-328–29, 3-ER-351, 3-ER-360–61, ¶¶ 92, 141, 160.

Defendants' responses to the crime wave they spawned have been underwhelming. Initially, they suggested that owners use steering wheel locks like "The Club," and offered some cities wheel locks to

11

distribute. *See* ER-332, ¶ 101. These devices, however, are not wholly effective, and municipalities are not set up to distribute auto parts. *Id*.

More recently, the Defendants have rolled out a "software update," but not all the relevant vehicles are even eligible for it. 3-ER-332–33, ¶¶ 102–103. Data also shows that the update has by no means solved the theft problem. *See* 3-ER-333, ¶¶ 104–105. Plus, owners have complained of technical problems with the update. *See* 3-ER-335, ¶ 108.

## III. The district court upholds the Municipalities' claims against Defendants.

A number of local governments filed suit against the Defendants, seeking to require them to internalize the cost of the thefts. Their actions were later transferred to the Central District of California and consolidated into a multidistrict litigation under 28 U.S.C. § 1407.

In July 2023, local governments from Indiana, Maryland, Missouri, New York, Ohio, Washington, and Wisconsin filed a consolidated complaint asserting claims under their respective states' laws. 4-ER-632. The Municipalities relevant to this appeal asserted negligence and public-nuisance claims under New York, Ohio, and Wisconsin law. The Municipalities allege that Defendants failed to

exercise reasonable care by failing to "install[] immobilizer devices, or an equivalent anti-theft device, in all their vehicles." 3-ER-305, ¶ 13.

The Defendants moved to dismiss the consolidated complaint in its entirety under Rule 12(b)(6). 2-ER-127. They emphasized that their vehicles contained anti-theft technology that complied with federal law. *See, e.g.*, SER-4 ("Plaintiffs do not allege that the vehicles at issue lack either ignition locks that prevent normal activation or steering-column locks that prevent steering without a key."). Thus, along with advancing specific arguments against each kind of claim, Defendants maintained that *all* the claims were preempted.

The district court largely denied the motion to dismiss. It rejected Defendants' argument that the governments' claims were preempted by the federal regulation on anti-theft devices, FMVSS 114. *See* 1-ER-7. It also ruled that under the consolidated complaint's allegations, Defendants owed a duty of care to the local governments. It forcefully rejected the notion that third parties' criminal conduct somehow foreclosed a duty. *See* 1-ER-8, 11–12. In the court's view, it was also entirely foreseeable that failing to use reasonable care in the design and manufacture of anti-theft devices would force municipalities to bear the

burden of increased theft. 1-ER-9. On top of this, public policy favored recognition of a duty of care, given the gravity of the harm to local governments and the relatively slight burden that such a duty placed on Defendants. 1-ER-10.

Defendants thereafter moved to certify the court's entire motion-to-dismiss ruling for interlocutory appeal under 28 U.S.C. § 1292(b). The district court rejected most of the motion, ruling that immediate appeal was warranted only on whether Defendants owed the Municipalities a duty of care under Wisconsin, New York, and Ohio law. 2-ER-116. The district court also denied Defendants' motion to stay the litigation, later ordering an aggressive discovery schedule for all parties. 2-ER-116–17. This Court then granted Defendants' ensuing petition. 3-ER-447.

## SUMMARY OF ARGUMENT

**1.** Defendants say that the Wisconsin, New York, and Ohio negligence claims should have been dismissed because they seek to hold Defendants liable for third parties' criminal acts. But if a defendant negligently produces equipment whose explicit purpose is to protect against third-party criminals, third-party criminal activity will

inevitably result. In these circumstances, courts have not applied the "third-party" rule that Defendants invoke. The reason is obvious: a defendant should not be allowed to point to an inevitable result of its own negligence to immunize itself from liability for that negligence.

Beyond that fundamental flaw, more specific flaws attend Defendants' arguments about Wisconsin, New York, and Ohio case law.

Under Wisconsin law, duty is determined by foreseeability of injury—and on appeal, Defendants do not dispute that the injuries here were foreseeable. To bypass Wisconsin's duty framework, Defendants rely on a narrow line of cases that concern a party's duty to actively intervene to protect against either a specific third party's, or against the plaintiff's own, conduct. But the Municipalities do not ask for recognition of a duty to intervene to prevent the conduct of persons they do not immediately control. They merely ask for recognition of a duty to exercise reasonable care while vehicles, and the anti-theft equipment they contain, are still in Defendants' control—before car thieves ever enter the picture.

Under New York law, duty is decided by a mix of factors, all of which point decidedly to the existence of a duty here. Rather than

analyzing those factors, Defendants rely solely on the no-duty-to-control-third-parties rule. But the New York cases that have applied that rule declined to recognize a duty to actively control or intervene against third parties. They did not address the duty at issue here—a duty to exercise reasonable care in designing or installing an anti-crime device while it is still under one's own control.

Under Ohio law, Defendants' argument against a duty of care conflict with *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002). There, a city alleged that gun makers, trade associations, and a distributor had failed to exercise reasonable care in the design, manufacture, marketing, and distribution of firearms. The Ohio Supreme Court upheld the claim. Defendants seek to distinguish *Beretta* on the ground that the defendants' conduct there was "malfeasance" rather than nonfeasance. But the kind of negligence alleged here is, in every relevant way, identical to the kind of negligence alleged in *Beretta*.

**2.** In the district court, Defendants submitted an expansive motion for an immediate appeal under 28 U.S.C. § 1292(b). The district court, however, decided that only the Ohio, New York, and Wisconsin

16

negligence claims were appropriate for immediate appeal. It is jurisdictionally questionable whether Defendants can expand this appeal to other claims. Beyond that issue, however, accepting Defendants' invitation to address other issues would license what, in effect, is a bait and switch. In their petition, Defendants sold the Court a relatively simple appeal. Their brief on the merits, however, seeks to turn that appeal into one that would require the Court to make *Erie* guesses about wholly different bodies of state law. For reasons of judicial administration, the Court should follow its usual practice and decline to expand this interlocutory appeal.

**3.** In an abundance of caution, however, the Municipalities have responded to Defendants' additional arguments.

Preemption: Defendants argue that a regulation governing anti-theft devices, FMVSS 114, impliedly preempts the Municipalities' state-law claims, as these claims would allegedly frustrate a regulatory objective. But unlike in *Geier v. America Honda Motor Co.*, 529 U.S. 861 (2000), which found implied preemption, and *Williamson v. Mazda Motor of America Inc.*, 562 U.S. 323 (2011), which did not, the Municipalities' claims do not restrict manufacturers to one specific

17

device. Instead, they allege that Defendants breached their duty by failing to equip vehicles with a particular *level* of anti-theft protection. Defendants fail to show that requiring this level of anti-theft protection would conflict with the goals of FMVSS 114. The history of the regulation shows that it was not meant to prevent states from requiring higher standards for anti-theft protection.

Missouri negligence: Defendants again invoke the rule that there is generally no duty to prevent against third-party criminal conduct. Even if that rule could apply here, which is doubtful, Missouri courts recognize that the third-party rule does not categorically bar a duty of care and may be overridden by a high degree of foreseeability. They have also recognized that the third-party rule can be trumped by the totality of the circumstances or important public policy concerns. All of these considerations strongly favor a duty here: The harm was especially foreseeable, Defendants are uniquely situated to address the problem, and resulting harm has been severe, and the burden of implementing necessary anti-theft measures would be relatively low.

Public nuisance: Defendants maintain that public nuisance claims under Wisconsin, New York, and Missouri law must fail due to the lack

of a negligence duty. First, of course, there *is* a negligence duty. But even if there were not, Defendants' account of the law of each state is simply inaccurate. No Wisconsin court has ever linked a negligence duty with public nuisance. New York courts have made clear that even if a duty must exist for a public nuisance claim, it is a duty toward the public, not a private negligence duty; even if the latter does not exist here, the former certainly does. Missouri courts, finally, have explicitly held that public nuisance claims do not turn on the viability of negligence claims.

## ARGUMENT

## I.   Defendants owed the Municipalities a duty of care.

In arguing that they owed the Municipalities no duty of care, Defendants make two kinds of error, each independently fatal to their position. First, they commit a fundamental error that applies across the three jurisdictions at issue in this appeal (Wisconsin, New York, and Ohio). Second, Defendants provide an erroneous account of the law of each jurisdiction.

**A.** **The doctrine that there is generally no duty to control the actions of third parties does not apply to an item like anti-theft technology, whose very purpose is deterring third-party misconduct.**

In their primary argument against the Municipalities' negligence claims, Defendants assert that there is generally no duty of care to protect another against, or control the actions of, a third person. That assertion may be correct, but it is beside the point.

Defendants' argument ignores a more fundamental rule of tort law—so fundamental, in fact, that it rarely needs to be stated explicitly. That rule is that when persons decide to engage in an affirmative activity, such as equipping cars with anti-theft technology, they must exercise reasonable care.

Crucially, this fundamental duty of care still applies even though the purpose of equipping cars with anti-theft equipment is to protect against third-party criminals. For if a defendant negligently produces equipment whose explicit purpose is to protect against third-party criminals, the inevitable consequence of that negligence will be third-party criminal activity. The defendant cannot point to an inevitable consequence of its own negligence to immunize itself from liability for that negligence. That would be obvious bootstrapping.

20

For this reason, courts have enforced duties of care against manufacturers of anti-crime devices that allegedly failed to properly protect against criminals. In *House v. Armour of America, Inc.*, 929 P.2d 340, 345–46 (Utah 1996), the Utah Supreme Court held that there was a genuine issue of fact on whether body-armor manufacturers had satisfied their duty to warn a law-enforcement officer about the armor's limitations against certain weapons wielded by criminals. *See also Linegar v. Armour of Am., Inc.*, 909 F.2d 1150 (8th Cir. 1990). And in *Moroney v. General Motors Corp.*, 850 A.2d 629 (Pa. Super. Ct. 2004), where a car owner assaulted in her vehicle alleged that the vehicle's door lock was defective, a Pennsylvania court ordered a new trial on the plaintiff's claim of negligent design. *Id.* at 635–36. In neither of these cases was there any suggestion that because criminals were involved, defendants were under no duty of care.

The result should be the same here.[4] The Defendants designed and installed anti-theft equipment in their vehicles to do what the

---

[4] It is no answer that *House* and *Moroney* were brought by users of the products, whereas this action is brought by local governments. Defendants are not arguing that that distinction somehow defeats a duty of care. Instead, they are arguing that the duty of care is defeated by the rule that there is no duty to control criminal third parties.

equipment's name suggests: protect against theft. Having included anti-theft equipment in their vehicles, they cannot escape liability for negligence in design and installation merely by protesting that it was thieves who stole the vehicles. If that were the rule, anyone providing any product or service intended to protect against criminals would be immunized against liability for negligence, because the negligent failure of that product or service would *always* involve third-party criminals.

According to Defendants, however, there is a universal rule of no liability for "conduct that allegedly makes a car easier for a third-party thief to steal." OB 28. To support that rule, Defendants cite cases in which the owner or user of a vehicle had failed to reasonably safeguard the vehicle against theft, the vehicle was stolen, and the plaintiff was later injured by the stolen vehicle. *See Richards v. Stanley*, 271 P.2d 23, 24–25 (Cal. 1954); *Dix v. Motor Mkt., Inc.*, 540 S.W.2d 927, 929 (Mo. Ct. App. 1976); *Epstein v. Mediterranean Motors, Inc.*, 491 N.Y.S.2d 391, 392 (App. Div. 1985). None of these cases involved a car maker's negligence, let alone a car maker's negligent design or manufacture of equipment intended to protect against theft. Instead, the defendants

were end users who lacked control over the intrinsic design of the vehicles.

### B.   A duty of care exists under Wisconsin law.

### 1.   Under Wisconsin law, there is a general duty of care that applies to Defendants' activities here.

Wisconsin follows the "view of duty set forth in the dissent of *Palsgraf v. Long Island Railroad.*" *Alvarado v. Sersch*, 662 N.W.2d 350, 353 (Wis. 2003). Under that view, "[e]very person has a duty to use ordinary care in all of his or her activities, and a person is negligent when that person fails to exercise ordinary care." *Id.* Duty is determined by foreseeability: "a duty to use ordinary care is established whenever it is foreseeable that a person's act or failure to act might cause harm to some other person." *Id.* The scope of the defendant's liability in Wisconsin is determined by "[t]he doctrine of public policy, not the doctrine of duty." *Id.* at 354 (quoting *Bowen v. Lumbermens Mut. Cas. Co.*, 517 N.W.2d 432, 439 (1994)). Under that doctrine, Wisconsin courts consider six "public policy considerations" that may preclude liability even when there is a negligent breach of a duty. *Id.*

The Defendants do not dispute that if they fail to exercise reasonable care in the design or manufacture of an anti-theft device, it

is foreseeable that the authorities responsible for responding to crime—Plaintiffs—will bear the costs of the increased theft. They are wise not to dispute it. As the district court recognized, "[w]hether it is through the theft of a car, the fleeing of suspects, or the collision with other vehicles, property, or persons, perhaps no other product impacts public safety or engages law enforcement and municipal governments to a greater extent than automobiles." 1-ER-9. "It is foreseeable, then, that the lengths a manufacturer will go—or not go—to design their cars with protections against theft will determine the burden others will bear to respond to such theft." *Id.*

Because Defendants cannot dispute foreseeability, they are forced to rely on a narrow sliver of Wisconsin case law that does not apply here for several independently sufficient reasons. Defendants describe these cases as if they decided there was no duty of ordinary care, OB 23–25, but that is inaccurate. Instead, the cases decided that the defendants in those cases were not subject to a heightened standard of care—a standard of care that the Municipalities are not asking to be applied here.

24

In two of Defendants' cases, an injured party argued unsuccessfully for a duty to monitor or control the conduct of, or to warn against the misconduct of, a third party. Thus, in *Hornback v. Archdiocese of Milwaukee*, 752 N.W.2d 862 (Wis. 2008), the Wisconsin Supreme Court rejected a diocesan employer's duty to warn "all potential subsequent employers within dioceses and parochial schools across the country, along with all parents of future unforeseeable victims," of a former employee's propensity to abuse children. *Id.* at 872. In *Hoida, Inc. v. M & I Midstate Bank*, 717 N.W.2d 17 (Wis. 2006), a bank had loaned a property owner about $1.3 million to finance the construction of apartments on the property. *Id.* at 22. The owner and general contractor on the construction project later fraudulently misappropriated about half of that sum, which in turn caused a subtractor, Hoida, to incur losses. *Id.* at 24. Hoida then sued the lending bank and its agent for negligence, arguing that the duty of care required them to monitor the progress of the construction and to identify and contact every subtractor before disbursing funds. *See id.* at 26. The court rejected such a duty. *Id.* at 33.

The duties rejected in *Hornback* and *Hoida* are miles away from the duty the Municipalities seek to enforce here. In those cases, the court rejected a duty to warn against (*Hornback*) or to actively monitor and intervene against (*Hoida*) third parties that were not under the defendants' immediate control. These holdings might be relevant if the Municipalities were arguing that the Defendants had a duty to warn governments against car thieves, or to monitor and then intervene against them. But the Municipalities are not arguing for a duty that would require car makers to warn against, or to monitor and intervene against, third-party car thieves. They are arguing for a duty that simply requires car makers to exercise reasonable care in designing and manufacturing anti-theft technology in the cars themselves, while the vehicles are still under the car makers' control and before car thieves ever come into the picture. This is not a duty about which *Hornback* or *Hoida* have anything relevant to say.

Even further afield are the other Wisconsin cases on which Defendants rely, *Hofflander v. St. Catherine's Hospital, Inc.*, 664 N.W.2d 545 (Wis. 2003), and *Jankee v. Clark County*, 612 N.W.2d 297 (Wis. 2000). In both cases, involuntarily committed patients with

mental health issues had escaped through a hospital window and then injured themselves. *Hofflander*, 664 N.W.2d at 551; *see Jankee*, 612 N.W.2d at 301. In both cases, the question was whether the mental hospital had breached a duty to intervene and prevent the patient's escape. *Hofflander*, 664 N.W.2d at 557; *Jankee*, 612 N.W.2d at 321. In *Jankee*, the hospital had not, as a matter of law; in *Hofflander*, a trial was required to resolve the question. *Jankee*, 612 N.W.2d at 324; *see Hofflander*, 664 N.W.2d at 580–81. As *Hofflander* noted, the sort of duty involved in these cases was "an exception to standard negligence law because it contemplates the possibility of a heightened duty of care for a defendant": namely, "a duty to do some act of commission to prevent harm." 664 N.W.2d at 571.

*Jankee* and *Hofflander* thus speak to the circumstances in which a defendant was under a duty to intervene against the plaintiff's behavior. That is not a duty for which anyone is arguing here. The Municipalities are not asking the Court to recognize a duty to intervene directly against car thieves, let alone a duty to intervene directly against the Municipalities. They are not asking for active intervention against anyone at all. They are simply asking that when Defendants

27

equip their vehicles with anti-theft devices, they be required to exercise reasonable care.

While the Defendants strain to describe the duty at issue here as an affirmative duty "to control the conduct of a third person," OB 24 (quotation and citation omitted), they cannot cite a single case to support that description. They have not cited, and the Municipalities cannot find, a Wisconsin decision suggesting that a duty to exercise reasonable care in the design and manufacture of anti-theft devices, or anything else, is considered an affirmative duty. *Cf. Murphy v. Columbus McKinnon Corp.*, 982 N.W.2d 898, 913–14 (Wis. 2022) (allowing claim to proceed involving a manufacturer's allegedly negligent omission of additional contact surfaces from pole-lifting metal tongs); *Fischer v. Cleveland Punch & Shear Works Co.*, 280 N.W.2d 280, 282, 284–85 (Wis. 1979) (affirming jury verdict for plaintiff based on manufacturer's failure to include an automatic switch and an interlocking circuit in the design of a punch press). This means that the normal rule of Wisconsin law applies here: all persons have a duty to use ordinary care in their activities and are negligent when they fail to exercise ordinary care. *Alvarado*, 662 N.W.2d at 353.

### 2. Defendants do not even attempt an argument that Wisconsin's traditional public-policy considerations bar liability here.

Because Defendants' brief does not argue that they exercised ordinary care or that a breach of care did not cause injury, "the question of duty is irrelevant and a finding of nonliability can be made only in terms of public policy." *Alvarado*, 662 N.W.2d at 354 (quoting *A.E. Inv. Corp. v. Link Builders*, 214 N.W.2d 764, 767 (Wis. 1974)). In determining whether public policy bars liability, Wisconsin courts examine six considerations. *See id.* Typically, however, they examine these considerations after the facts have been fully established at trial. *See id.* at 355 ("In most cases, the better practice is to submit the case to the jury before determining whether the public policy considerations preclude liability.").

Perhaps recognizing this fact, the Defendants do not make any arguments about Wisconsin's six public-policy considerations, much less demonstrate that those considerations bar liability. They have therefore forfeited that issue, and there is no reason for the Court to address it. *See, e.g.*, *United States v. Gomez*, 6 F.4th 992, 1003 n.12 (9th Cir. 2021) ("[W]e review only issues that are argued specifically and distinctly in a

party's opening brief . . . ."). Rather, it should affirm the district court's ruling on the Wisconsin negligence claims on the ground that Defendants owe the Municipalities a duty of care.

### C. A duty of care exists under New York law.

In New York, courts determine whether there is a duty of care "by balancing factors." *Palka v. Servicemaster Mgmt. Servs. Corp.*, 634 N.E.2d 189, 193 (N.Y. 1994). These factors "includ[e] the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Id.*

These factors favor recognition of a duty here. All persons reasonably expect that car manufacturers will exercise reasonable care in equipping vehicles with anti-theft equipment. Devices to prevent vehicle theft have existed for more than a century, and the risks of theft resulting from inadequate protection are notorious. *See supra* Statement of the Case, § I. Claims like the Municipalities' are highly unlikely to proliferate, precisely because the vast majority of vehicles other than Defendants' contain industry-standard anti-theft technology.

30

3-ER-303–04, ¶ 7. For the same reason, and because the potential pool of plaintiffs is inherently restricted, liability is decidedly not unlimited. Requiring manufacturers to internalize the social costs of negligently designed anti-theft devices is not disproportionate or otherwise unfair. Manufacturers are uniquely positioned to minimize the risk from substandard devices. *See Landon v. Kroll Lab. Specialists, Inc.*, 999 N.E.2d 1121, 1124 (N.Y. 2013) (noting that the defendant was "in the best position to prevent" the injury). The expenses the Municipalities have paid, and the opportunity costs they have incurred in responding to the wave of theft, far outweigh the cost of complying with their duty. *That* cost is trivial enough that just about all manufacturers other than Defendants have borne it voluntarily. *See* 3-ER-303–04, ¶ 7.

Defendants, however, maintain that a duty to exercise reasonable care in anti-theft design is barred by New York's rule that there is no "dut[y] to prevent third-party crimes" absent a "special relationship." OB 20 (citations omitted). In fact, it is Defendants who seek to radically expand that rule to a context where it has never applied. No New York court has ever applied that rule to a producer of equipment whose only

purpose was to prevent crime. None of the New York cases that Defendants cite involved such a situation. *See* OB 20–22.

In addition, those cases declined to recognize a duty that would have required a defendant to actively control or intervene against third parties, rather than, as here, to exercise reasonable care in designing or installing an anti-crime device while it is still under one's own control. Thus, *Jonathan A. v. Board of Education*, 779 N.Y.S.2d 3, 5–6 (App. Div. 2004), rejected a duty to control the hiring practices of a wholly independent organization. *Hanna v. St. Lawrence County*, 825 N.Y.S.2d 798, 801–02 (App. Div. 2006), held that the relatives of a domestic abuser placed on house arrest had no duty to intervene to control his actions. In *He v. Apple, Inc.*, 139 N.Y.S.3d 409, 411, 413 (App. Div. 2020), the court declined to recognize a duty to actively intervene against specific third parties—namely, to suspend the iTunes accounts of scammers that duped their victims into buying them thousands of dollars in gift cards. And in two other cases, the plaintiffs asked the court to recognize a duty by gun or bullet manufacturers not to control how their products were designed or made, as here, but to control how they were sold once they were out of the manufacturers' possession.

*Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1060 (N.Y. 2001); *McCarthy v. Olin Corp.*, 119 F.3d 148, 157 (2d Cir. 1997). None of these cases are relevant to the duty that the Municipalities seek to enforce here, where Defendants could have designed and manufactured vehicles with reasonable anti-theft technology while they were still under their control.

### D.    A duty of care exists under Ohio law.

In Ohio, the question of duty typically turns on foreseeability: "The existence of an actor's duty to another person usually arises from the foreseeability of injury to someone in that other person's general situation." *See Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 929 (Ohio 2015) (quotation marks and citation omitted). Because the Municipalities' injuries here were eminently foreseeable, *see supra* Argument § I.B, Defendants owed them a duty of care under Ohio law.

According to Defendants, though, an exception to these usual principles applies, because Ohio courts have held that there is generally no duty to control the conduct of third parties. *See* OB 22–23. This position, however, cannot be reconciled with *Cincinnati v. Beretta*

*U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), which speaks directly to this case.

In *Beretta*, a city brought a negligence claim against gun makers, trade associations, and one distributor, alleging that they had "fail[ed] to exercise reasonable care" in the design, manufacture, marketing, and distribution of firearms. *Id.* at 1144. Through this negligence, the defendants "fostered the criminal misuse of firearms [and] helped sustain the illegal firearms market" and required the city to spend more on law enforcement and emergency and health services. *Id.* at 1140.

As here, the *Beretta* defendants argued that they could not be liable because, without a "special relationship," they had no duty to control third parties' conduct. *See id.* at 1144. The Ohio Supreme Court concluded that this rule had no application, because the relevant duty was not a duty to control third parties but a duty to exercise due care in "manufacturing, marketing, and distributing" firearms. *Id.* The Municipalities are alleging the breach of a similar duty: the duty to exercise due care in the design and manufacture of anti-theft devices.

Defendants claim that *Beretta* does not apply here because the defendants there "were accused of affirmative *malfeasance*," whereas

34

here Defendants are culpable of nonfeasance. OB 23 n.6. But the
*Beretta* court characterized the negligence claim there as alleging that
the manufacturers "are themselves negligent by manufacturing,
marketing, and distributing firearms in a way that creates an illegal
firearms market that results in foreseeable injury." *Beretta*, 768 N.E.2d
at 1144. This was the breach of duty that the court recognized. *See id.*
at 1145. Similarly here, the Municipalities' negligence claim alleges
that the Defendants undertook to include anti-theft equipment in their
vehicles, but designed that equipment in a way that created an
enormous and foreseeable risk of vehicle theft. Because the conduct of
the *Beretta* defendants was malfeasance under Ohio law, so was the
conduct of the Defendants here.

The Ohio Court of Appeals cases on which Defendants rely, *see* OB
22–23, cannot undercut *Beretta* as a statement of Ohio law, especially
since the duties they rejected were so different from the one at issue
here. In *Becker v. Cardinal Health, Inc.*, 179 N.E.3d 769 (Ohio Ct. App.
2021), the plaintiffs' claim of negligent distribution would have imposed
a duty to control the conduct of third-party pharmacies. *See id.* at 775
(defendant "neither manufacture[d] opioids nor [sold] them to

individual consumers," but instead received the opioids from manufacturers and then distributed them to pharmacies that actually dispensed the prescriptions). And in *Estate of Ciotto v. Hinkle*, 145 N.E.3d 1013, 1033 (Ohio Ct. App. 2019), the court declined to recognize a duty to act affirmatively to secure a firearm against a particular individual's potential misuse of it. Neither case involved a duty to exercise reasonable care in *the defendant's own* design and manufacture of equipment whose purpose is to prevent crime.

## II. The Court should decline Defendants' invitation to ignore the scope of the district court's certification.

After the district court largely denied their motion to dismiss, Defendants moved for certification under 28 U.S.C. § 1292(b). They asked the district court to certify for appeal the question "[w]hether plaintiffs sufficiently alleged a tort duty to protect against third-party criminal conduct under the laws of Indiana, Maryland, Missouri, New York, Ohio, Washington, and Wisconsin." SER-10. After surveying the states' case law, the district court determined that the duty question under Indiana, Maryland, Missouri, and Washington law was not appropriate for certification, and certified the question only as to New York, Ohio, and Wisconsin law. 2-ER-113–16. It also noted that

Defendants asserted in passing that duty was "fundamental" to the public nuisance claims in this case but did "not offer more than conclusory statements" to support that position. 2-ER-113 (citation omitted).

Despite the narrowness of the district court's certification, Defendants ask this Court to address preemption, the public nuisance claims asserted under New York, Ohio, and Wisconsin law, and the Missouri negligence and public-nuisance claims. But this Court typically declines to expand an appeal beyond the issues that a district court certifies under § 1292(b). *See, e.g.*, *Bluetooth SIG Inc. v. FCA US LLC*, 30 F.4th 870, 874 (9th Cir. 2022); *Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 950 (9th Cir. 2021), *vacated and remanded on other grounds*, 598 U.S. 759 (2023); *Rollins v. Dignity Health*, 830 F.3d 900, 912–13 (9th Cir. 2016), *rev'd on other grounds sub nom. Advocate Health Care Network v. Stapleton*, 581 U.S. 468 (2017); *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1175 n.2 (9th Cir. 2016); *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 689 (9th Cir. 2011); *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). There are multiple reasons to follow that usual practice here.

For one thing, it is not clear whether the Court has jurisdiction to reach claims other than the New York, Ohio, and Wisconsin negligence claims. Three circuits have held that although a Court of Appeals can address legal *questions* that the district court did not certify under 28 U.S.C. § 1292(b), it cannot address *claims* other than ones that the district court certified, even if the court addressed both certified and uncertified claims in the same document. *See Ingram v. Wayne Cnty.*, 81 F.4th 603, 612–13 (6th Cir. 2023), *abrogated on other grounds by Culley v. Marshall*, 601 U.S. 377 (2024); *Homeland Stores, Inc. v. Resolution Tr. Corp.* 17 F.3d 1269, 1271–72 (10th Cir. 1994); *FDIC v. Dye*, 642 F.2d 833, 837, 837 n.6 (5th Cir. Unit B Apr. 1981). These decisions decline to make jurisdiction turn on the "formalistic anomaly" of what a district court has happened to include in, or exclude from, a document. *Little v. Louisville Gas & Elec. Co.*, 805 F.3d 695, 698–99 (6th Cir. 2015). Instead, they read the reviewable "order" in § 1292(b) to "refer[] to a specific direction or command from the district court, not to the document or opinion in which the court explains that direction or command." *Id.* at 699. This Court does not appear to have explicitly addressed this jurisdictional issue. *Cf. Beaver*, 816 F.3d at 1175 n.2

38

(stating in dicta that the Court has "jurisdiction to review claims not certified by the district court"). The Court need not address it at all if it confines this appeal to the claims that the district court certified for appeal.

Beyond this jurisdictional question, the Court should not encourage the bait and switch that Defendants are trying to accomplish. In urging this Court to accept review, Defendants framed this appeal as involving simple questions of duty under the negligence case law of three states. *See* Pet. for Permission to Appeal 13–15 (filed in No. 24-739) (quotation marks and citation omitted). They now invite the Court to range beyond the law of those three states, and beyond negligence altogether, to decide wholly different issues. *See Nicholson v. CPC Int'l Inc.*, 877 F.2d 221, 231 (3d Cir. 1989) (declining to reach noncertified issue because "the analysis required to consider" it was "different"), *abrogated on other grounds by Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991). Allowing Defendants to transform the streamlined appeal that the Court thought it was accepting would encourage gamesmanship and undermine the role of the district court and the motions panel that granted Defendants' petition. *See Kuehner v.*

*Dickinson & Co.*, 84 F.3d 316, 318–19 (9th Cir. 1996) (according "deference" to the motions panel); *Sperling v. Hoffman-La Roche Inc.*, 862 F.2d 439, 444 (3d Cir. 1988) (stating that it would "undermine the statutory scheme" to address an issue the district court had held was not appropriate for certification), *aff'd and remanded*, 493 U.S. 165 (1989).

## III. The federal regulation governing anti-theft devices does not preempt the Municipalities' claims.

Defendants maintain that a regulation promulgated under the Act preempts the Municipalities' state-law claims. Those claims cannot be expressly preempted by the Act itself, which explicitly preserves common-law claims. 49 U.S.C. § 30103(e). So Defendants instead argue that a regulation promulgated under the Act impliedly preempts the Municipalities' claims because those claims, if successful, would frustrate an objective of the regulation.[5] This argument does not succeed.

For their preemption argument, Defendants rely on *Geier v. America Honda Motor Co.*, 529 U.S. 861 (2000) and *Williamson v.*

---

[5] This kind of preemption is often referred to as "obstacle preemption." *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019).

*Mazda Motor of America Inc.*, 562 U.S. 323 (2011). In both cases, the plaintiffs' legal theory was that state law required car manufacturers to adopt one kind of passive restraint device instead of another. In both cases, the defendant claimed this theory was preempted by a regulation that expressly gave manufacturers a choice among different kinds of passive restraint. And in both cases, the dispositive question was whether "giving auto manufacturers a choice among different kinds of passive restraint devices was a *significant objective* of the federal regulation." *Williamson*, 562 U.S. at 330 (describing the determination "[a]t the heart of *Geier*"). In *Geier*, the Court answered that question in the affirmative, and hence found preemption. In *Williamson*, it did the opposite.

In relying on *Geier* and *Williamson*, however, Defendants face a threshold problem: the kind of potential conflict at issue in those cases cannot, even in principle, be present here. In those cases, the plaintiffs' legal theory was that the common law required one particular device. *See Williamson*, 562 U.S. at 327 (plaintiffs "claimed that Mazda should have installed lap-and-shoulder belts on rear aisle seats"); *Geier*, 529 U.S. at 865 ("[T]he plaintiff claims" that the defendant should "have

41

equipped a 1987 automobile with airbags."). Thus, preemption depended on whether restricting manufacturers to one device only would frustrate a "significant [federal] regulatory objective." *Williamson*, 562 U.S. at 332.

By contrast, the Municipalities' legal theory is that the Defendants breached their duty by equipping their cars with substandard anti-theft technology, and that they could have fulfilled that duty by installing "immobilizer devices, *or an equivalent anti-theft device*, in all their vehicles." 3-ER-305, ¶ 13 (emphasis added). So preemption here turns on whether requiring not any one device, but merely a general *level* of anti-theft protection, would frustrate a significant federal regulatory objective.

Defendants have not even attempted to show this kind of conflict with a regulatory objective. This is true for two independently sufficient reasons.

*First*, Defendants tacitly assume that by requiring a particular level of theft protection, the Municipalities' claims would restrict manufacturers to one kind of existing anti-theft device: immobilizers. That is a factual assumption that Defendants have the burden of

42

proving. *See Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1289 (9th Cir. 2021) ("Preemption is an affirmative defense, so the defendant bears the burden of pleading and supporting its preemption argument."). And it is a factual assumption that they have failed to support (and that the Municipalities contest). In fact, Defendants have not even attempted to show that, out of all existing anti-theft devices, only immobilizers can provide adequate theft protection. For this reason alone, Defendants have failed to show preemption.

*Second*, even if the Municipalities' claims did restrict manufacturers to only one kind of *existing* anti-theft device, Defendants' attempt to show a conflict with FMVSS 114 would still fail. The claims would still not restrict manufacturers from developing *new* kinds of anti-theft devices that provide comparable protection. That fact is crucial, because Defendants' preemption argument relies on regulatory statements that encourage technological improvement rather than mandating flexibility for its own sake.

Before first promulgating FMVSS 114, the federal regulator received comments "ask[ing] that specific theft protection devices be prescribed." Initial Federal Motor Vehicle Safety Standards, 33 Fed.

43

Reg. 6471, 6472 (Apr. 26, 1968); *see also* OB 52, 55 (citing this
regulation). The agency responded that "it would be unwise to establish
a standard in terms so restrictive as to discourage technological
innovation in the field of theft inhibition. *Consequently*, the standard
has been framed to permit as many specific devices as possible to meet
its requirements." 33 Fed. Reg. at 6472 (emphasis added). As
"[c]onsequently" expresses, the agency did not prescribe specific devices
not because flexibility was a goal in itself, or because it wanted to keep
certain existing designs on the market, *cf. Geier*, 529 U.S. at 878–79,
but because it wanted to foster technological progress.

    In 1990, the agency published a regulation "intended to reduce the
potential for accidents" that sometimes resulted from the key-locking
systems then used as part of anti-theft systems. FMVSS 114; Theft
Protection, 55 Fed. Reg. 21868, 21868 (May 30, 1990); *see* OB 55 (citing
regulation). Two manufacturers had commented that a proposed rule's
"overly precise requirements . . . would limit new designs and
innovations." *Id.* at 21871. In response, the agency "broadened the
proposed requirements . . . wherever such changes would not adversely
affect theft protection or safety." *Id.* at 21872. The agency thus agreed

44

that the wording of the regulation should not limit new designs and innovations. It did not suggest that it wanted to preserve certain existing options because they were necessary to serve the goals of the regulation. *See O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 761 (5th Cir. 2007) ("There is no language . . . indicating that NHTSA intended to 'preserve the option' of using tempered glass in side windows, or that preserving this option would serve the safety goals of FMVSS 205."). To the contrary, the agency's comment that its changes of wording would preserve certain standards of "theft protection or safety" suggests that its goal was to set a minimum standard, not prevent the states from setting a higher standard. *See id.* (regulation and commentary of regulator "support the conclusion that [the regulation] is a minimum safety standard").

Finally, in 2006, the agency amended the terminology used in FMVSS 114, which had not changed "since its introduction more than 35 years ago." Federal Motor Vehicle Safety Standards; Theft Protection, 71 Fed. Reg. 17752, 17752 (Apr. 7, 2006). During that time, "[h]owever, theft protection technology has advanced considerably," making certain parts of the regulation "increasingly ambiguous when

applied to modern theft protection technology," such as electronic systems, that were "not contemplated by the Standard when it first went into effect." *Id.* That was the motivation behind "avoid[ing] terminology that was unnecessarily design-restrictive." *Id.* at 11753. The goal, in short, was to ensure that the regulation kept up with continued technological improvements like electronic immobilizers, not to preserve manufacturers' ability to choose among older, less effective options like the Defendants' technology here. Once again, the agency's goal was not to mandate flexibility for its own sake, but to ensure that anti-theft technology could *get better at preventing theft*. That goal is perfectly consistent with the Municipalities' claims here.

Defendants do not really respond to any of these points. Instead, they insist that the Municipalities' legal theory is that the only permissible anti-theft devices are immobilizers. OB 55–58. But they ignore the complaint's repeated assertions that the injuries alleged "could have been avoided had [Defendants] followed industry-wide standards and installed immobilizer devices, *or an equivalent anti-theft device*, in all their vehicles." 3-ER-305, ¶ 13 (emphasis added); *see* 3-ER-410, ¶ 307 (vehicles were "without an engine immobilizer *or equivalent*

46

*technology*" (emphasis added)); 3-ER-413, ¶ 329 (same); 3-ER-416, ¶ 349 (same).[6]

The allegations Defendants quote from the complaint, *see* OB 567, do not restrict the Municipalities to an immobilizer-only legal theory. First of all, the quoted allegations are simply meant to allege the wide availability of immobilizer technology—i.e., to show that Defendants could have easily complied with their duty of care. *See* 3-ER-304, 3-ER-404, ¶¶ 9, 274, 277. The allegations do not state that immobilizers were the only way Defendants could have complied with their duty. Second, even if those allegations somehow pled an immobilizer-only theory, the Municipalities can still pursue their explicitly stated theory that Defendants should have installed an immobilizer or any other equivalent technology. *See* Fed. R. Civ. P. 8(d)(2)–(3) (permitting allegations and claims in the alternative); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 n.10 (9th Cir. 2012) (discussing that rule). Most

---

[6] Defendants note that the district court dismissed a *different* complaint—a complaint by the City of Chicago—with leave to replead, because it read Chicago's complaint as asserting an immobilizer-only theory. OB 50–51. Once Chicago amended its complaint, the district court allowed it to proceed. *See id.* at 51. How there is any "inconsistency" in those decisions is unclear. *Id.*

47

fundamentally, the Municipalities have consistently maintained that they do *not* assert an immobilizers-only legal theory, SER-6–8, and Defendants cannot impede that theory by selectively quoting snippets from the complaint, since the purpose of a complaint is to state claims, not limit the plaintiff's legal theories. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).

## IV. A duty of care exists under Missouri law.

The Court should not address the questions of Missouri law that Defendants wish to raise here. *See supra* Argument § II. Should it do so, however, it should affirm the district court.

Under Missouri law, "a duty of care which is imposed by the law of negligence arises out of circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury." *Lowrey v. Horvath*, 689 S.W.2d 625, 627 (Mo. 1985). In their brief, Defendants do not contest foreseeability. Instead, they rely on the rule that there is generally "no duty to protect another person from the deliberate criminal attack of a third party." OB 36 (quotation marks and citation omitted). But no Missouri court has applied that rule to a comparable situation.

48

If anything, the case law suggests that when an item purposely designed to prevent crime is alleged to be defective, the manufacturer cannot escape its tort-law duties under Missouri law simply because it was a criminal who took advantage of that defect. In *Linegar v. Armour of America, Inc.*, 909 F.2d 1150 (8th Cir. 1990), a diversity case decided under Missouri law, a criminal shot and killed a law-enforcement officer wearing a bullet-resistant vest. The officer's survivors sued, alleging that the vest was defective. Although the Eighth Circuit concluded the vest was not defective, neither the defendant nor the court so much as hinted that the third-party rule on which the Defendants rely here was even relevant. As noted earlier, this is not surprising. If the third-party rule applied to cases like this one, a person providing a product or service specifically intended to protect against criminals would be immunized against liability for negligence, because the negligent failure of that product or service would necessarily involve criminals. *See supra* Argument § I.A.

But even in circumstances where the third-party rule applies, Missouri courts do not treat it as a categorical bar against duty. The rule can be trumped, for example, by an especially high degree of

foreseeability. Thus, *Madden v. C&K Barbecue Carryout, Inc.* held that, "depending upon the facts and circumstances of a given case," businesses may owe their invitees a duty to protect them from "the criminal attacks of unknown third persons." 758 S.W.2d 59, 62 (Mo. 1988), "The touchstone" for whether a duty of care existed, *Madden* held, was "foreseeability." *Id.* The kind of business at issue, actions taken that demonstrate the business's knowledge of the risk, and prior disruptive or criminal activity at the business can make crime sufficiently foreseeable to create a duty. *See Aziz ex rel. Brown v. Jack in the Box, E. Div., LP*, 477 S.W.3d 98, 104–05 (Mo. Ct. App. 2015) (considering the "totality of the circumstances"); *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54, 64–66 (Mo. Ct. App. 2002) (same). Somewhat similarly, *Faheen ex rel. Hebron v. City Parking Corp.*, 734 S.W.2d 270, 273–74 (Mo. Ct. App. 1987) and *Scheibel v. Hillis*, 531 S.W.2d 285, 288–90 (Mo. 1976) held that special circumstances can make injury sufficiently foreseeable that a landlord may owe a tenant, or a homeowner may owe a visitor, a protective duty.

Several of Defendants' own cases acknowledge the third-party rule but rely on the totality of the circumstances or public policy concerns to

50

recognize a duty nevertheless. *See* OB 37–39. Thus, *Kuhn v. Budget Rent-A-Car of Missouri, Inc.*, which recognized that a business can owe unrelated third-party drivers a protective duty, relied on "the enormous potential for harm" and other "special circumstances." 876 S.W.2d 668, 673–74 (Mo. Ct. App. 1994), *Bradley ex rel. Pope v. Ray* balanced "the cost of imposing [a] duty" against "the magnitude of preventable injury," and took into account not only the relationship between physician and patient but also the foreseeability of harm and Missouri's public policy, when it recognized that in some circumstances a psychologist has a duty to protect a patient against third parties. 904 S.W.2d 302, 310–12 (Mo. Ct. App. 1995).

Here, there are comparable factors favoring a duty, even if the third-party rule were to apply. There was an especially high degree of foreseeability from Defendants' failure to use due care in designing and installing their anti-theft equipment. The obvious systemic effectiveness of industry-standard anti-theft equipment, 3-ER-320, 3-ER-322–23, ¶¶ 68, 74–76, Defendants' own recognition of that effectiveness, 3-ER-323–24, ¶ 79, and the fact that the special susceptibility of Defendants' vehicles to theft manifested as early as 2015, 3-ER-325, ¶ 83, all made

51

it especially foreseeable that Defendants' negligence would lead to increased theft. Recognition of a duty is also favored by Defendants' unique ability to protect their vehicles from easy theft, the gravity of the harm, and the comparatively small burden that such a duty would place on Defendants. *See* 1-ER-10.

None of this is called into doubt by the other cases that Defendants cite. Two of them deal with quite different factual circumstances. *See Vittengl v. Fox*, 967 S.W.2d 269, 275–76 (Mo. Ct. App. 1998) (rejecting blanket duty by landlords to protect tenants); *Irby v. St. Louis Cnty. Cab Co.*, 560 S.W.2d 392 (Mo. Ct. App. 1977) (rejecting duty by taxi company to protect an independent contractor).

Other cases rejected a duty to protect against discrete acts of theft. Most of them did not involve a car maker's negligence. Thus, Defendants cite cases holding that in the circumstances presented—for the courts were not establishing a categorical rule[7]—the owner or user of a vehicle did not owe a third party a duty to protect against an act of theft. OB 36–37. Only one case did involve a car maker's negligence,

---

[7] *See Lavo v. Medlin*, 705 S.W.2d 562, 564 (Mo. Ct. App. 1986); *Dix*, 540 S.W.2d at 932 n.6.

*Lawton v. Hyundai Motor America, Inc.*, No. 24-00097-CV-W-BP, 2024 WL 2318623 (W.D. Mo. May 20, 2024). *Lawton* ruled that the maker owed the car owner no duty to protect against an individual act of theft of an individual vehicle. Whether or not *Lawton* was right to apply the third-party rule at all, it applied it to circumstances quite different from this case, which involves not the prevention of a particular theft, but a lack of reasonable care that increases *theft in general*—a species of harm that is both more grave and far more foreseeable.

## V. The Municipalities have stated public nuisance claims.

For multiple reasons, the Court should decline to expand this appeal to include public nuisance claims. *See supra* Argument § II. If it does reach those claims, however, it should affirm the district court.

### A. Under Wisconsin law, the concept of duty has never been applied to public nuisance claims.

As noted earlier, a duty of care is relevant under Wisconsin law only in exceedingly narrow circumstances that do not apply here. *See supra* Argument § I.B. Thus, the Wisconsin negligence claim here is governed by the usual rule that duty follows foreseeability. *See Alvarado*, 662 N.W.2d at 353. And Defendants do not dispute

53

foreseeability. As a result, duty is just not a relevant issue under Wisconsin law.

Nor has any Wisconsin court ever applied the concept of duty to bar an otherwise viable public nuisance claim. It is certainly true that the same public policy considerations that can limit liability for negligence are also relevant to nuisance. *See Butler v. Advanced Drainage Sys., Inc.*, 717 N.W.2d 760, 770–71 (Wis. 2006). But Defendants advance no argument about any of those considerations, so those considerations cannot serve as a ground for dismissal of the Wisconsin Municipalities' public nuisance claims.

Defendants imply that *Milwaukee Metropolitan Sewerage District v. City of Milwaukee*, 691 N.W.2d 658 (Wis. 2005) applied the concept of duty to a public nuisance claim, *see* OB 45 (citing 691 N.W. 2d at 679), but that implication is incorrect. The portion of the opinion they cite dismissed part of a nuisance claim under a statute providing immunity to governmental bodies or agents for discretionary acts. *See* Wis. Stat. § 893.80(4); *Milwaukee Metro. Sewerage Dist.*, 691 N.W.2d at 679–80. Under that statute, immunity turns not on the existence of a tort duty—since if that were true, there would be no need to resort to the

immunity statute in the first place—but instead on whether that duty is ministerial. *See Milwaukee Metro. Sewerage Dist.*, 691 N.W.2d at 679.

As a separate matter, Wisconsin courts recognize that public nuisance claims can be predicated not only on negligence, but also on intentional conduct. *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 646 N.W.2d 777, 788 (Wis. 2002). As Defendants concede, the Municipalities allege intentional conduct here. *See* OB 45 n.10. For that separate reason, the Wisconsin Municipalities have asserted valid public nuisance claims.

## B. Under New York law, public nuisance claims are independent of negligence duties.

New York courts have remarked that, as a practical matter, negligence and nuisance are often interrelated, because nuisances are generally produced through a lack of due care. *See McFarlane v. City of Niagara Falls*, 160 N.E. 391, 392 (N.Y. 1928); *see also Klepper v. Seymour House Corp. of Ogdensburg*, 158 N.E. 29, 31 (N.Y. 1927) ("These torts may be, and frequently are, coexisting and practically inseparable, as where the same acts or omissions constituting negligence give rise to a nuisance."). But the mere fact that negligence and nuisance are often practically interrelated does not show that

public nuisance, as a legal matter, requires proof of an independent negligence claim.

To the contrary, there are numerous cases squarely rejecting the notion that public nuisance in New York requires proof of fault. The Second Circuit, applying New York law, has held that a defendant can be "liable for maintenance of a *public* nuisance"—as opposed to a private one—"irrespective of negligence or fault." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir. 1985); *see also City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 343 (E.D.N.Y. 2007) ("In public nuisance cases, *in particular those brought by a public authority*, allegations of fault have generally been found to be irrelevant under New York law." (emphasis added)). Lower New York state courts have reached the same conclusion. *See In re Nassau Cnty. Consol. MTBE (Methyl Tertiary Butyl Ether) Prod. Liab. Litig.*, No. 601516/2009, 2010 WL 4400075, at *6 (N.Y. Sup. Ct. Nov. 4, 2010) ("An action for public nuisance, unlike a claim for private nuisance, does not require proof of a specific state of mind such as negligence or intent to harm . . . ."); *City of Rochester v. Premises Located at 10-12 S. Washington St.*, 687 N.Y.S.2d 523, 526 (Sup. Ct. 1998) ("[I]f a nuisance

be found to exist, respondents are liable 'irrespective of negligence or fault.'" (citation omitted)).[8]

To the extent some courts have required public nuisance plaintiffs to prove breach of a duty, they have not required breach of the type of duty giving rise to a private negligence claim. This flows from the fundamental difference between negligence and public nuisance. A public nuisance "is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency," and "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y., Inc.*, 362 N.E.2d 968, 971 (N.Y. 1977). A negligence claim, by contrast, requires that the defendant "owed not merely a general duty to society but a specific duty" to the plaintiff. *Hamilton*, 750 N.E.2d at 1060.

---

[8] In brief dicta, *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, a case involving a private nuisance, suggested that "negligence must be proven" in "either public or private" nuisance cases. 362 N.E.2d 968, 972 (N.Y. 1977). Needless to say, the cases cited in the text did not treat this passing statement as a binding pronouncement on New York law.

Thus, if a duty is "[a]t issue in public nuisance action[s]" at all, it "is a duty of care *to the public*." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 490 (E.D.N.Y. 2003) (emphasis added); *accord SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*, No. 20-cv-10731 (LJL), 2023 WL 2601161, at *10 n.8 (S.D.N.Y. Mar. 22, 2023); *A-1 Jewelry*, 247 F.R.D. at 345. The relevant breach of duty, in short, is a negligent invasion of public rights such as "the peaceful use of public streets, sidewalks, parks and other public places." *A-1 Jewelry*, 247 F.R.D. at 348 (quoting city's allegations).

A negligent invasion of public rights is precisely what the Municipalities allege. By failing to use reasonable care in the design and installation of anti-theft equipment in their vehicles, the complaint alleges, Defendants created a theft wave that has interfered with the peaceful use of public streets, sidewalks, and other public places, and with the physical safety of the public. *See, e.g.*, 3-ER-386, 3-ER-388–90, 3-ER-395, 3-ER-399–400, 3-ER-433, ¶¶ 227–228, 233–237, 247, 255–258, 463. This kind of interference constitutes an actionable public nuisance, even if the interference occurs through the instrumentality of a third person. *See, e.g.*, *Shaw's Jewelry Shop v. N.Y. Herald Co.*, 156

58

N.Y.S. 651, 654–55 (App. Div. 1915); *10-12 S. Washington St.*, 687 N.Y.S.2d at 527.

The cases that Defendants cite, OB 44, are not to the contrary. The relevant holdings in *Stevens & Thompson Paper Co. v. Middle Falls Fire Department*, 137 N.Y.S.3d 529, 534 (App. Div. 2020), *Sunlight Clinton Realty, LLC v. Gowanus Industrial Park, Inc.*, 86 N.Y.S.3d 617, 619–20 (App. Div. 2018), and *Murphy v. Both*, 922 N.Y.S.2d 483, 486 (App. Div. 2011) all concerned private nuisance, not public nuisance. And *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192 (App. Div. 2003) proves the point the Municipalities have already made. If a public nuisance claim turned on whether there was a duty of care under a negligence theory, the *Sturm* court could simply have stated that *Hamilton*'s rejection of a duty of care foreclosed a public nuisance claim. Instead, its lengthy analysis provided a number of reasons for rejecting the claim, and ultimately rested on concepts of proximate cause rather than duty. *See id.* at 201–02. It also emphasized that the product at issue there, guns, were not alleged to be defective, *see id.* at 200, 202—something that is decidedly not true for the anti-theft

equipment here. *See also Nassau Cnty.*, 2010 WL 4400075, at *6–7 (distinguishing *Sturm*).

Finally, in New York, public nuisance can be based on intentional conduct. *See AcuSport*, 271 F. Supp. 2d at 487. The Municipalities' allegations of intentional conduct, *see* OB 45 n.10, provide an independent ground for the public nuisance claim here.

### C. Under Missouri law, public nuisance claims are independent of negligence duties.

The Missouri Supreme Court has been very clear that liability for public nuisance does not turn on the viability of a negligence claim. "Nuisance is a condition and does not depend on the degree of care used; it depends on the degree of danger existing with the best of care." *Frank v. Envt'l Sanitation Mgmt.*, 687 S.W.2d 876, 880 (Mo. 1985). Thus, whether the defendant is liable for negligence is "immaterial to [its] liability for nuisance." *Id.* at 880 n.3; *see also Davis v. J.C. Nichols Co.*, 714 S.W.2d 679, 684 (Mo. Ct. App. 1986) ("Nuisance is a condition, not an act or failure to act and it is therefore immaterial in determining liability to inquire whether defendant was negligent and what his intention, design or motive may have been."). Over a century of Missouri case law says the same. *See, e.g., Scott v. City of Marshall*, 14

60

S.W.2d 694, 698 (Mo. Ct. App. 1929) ("Negligence is not necessary to create a nuisance."); *Swanson v. Bradshaw*, 187 S.W. 268, 269 (Mo. Ct. App. 1916) ("Even if defendant was using an approved method and was disposing of the garbage in a careful manner, this fact would not justify his interference with the reasonable and comfortable enjoyment by another of his property or his causing material injury thereto."); *Roth v. City of St. Joseph*, 147 S.W. 490, 491 (Mo. Ct. App. 1912) (noting that "[n]egligence is not an ingredient" of a public nuisance claim).

To argue otherwise, Defendants rely on cases that undermine their position. OB 45–46. In *Jackson v. City of Blue Springs*, 904 S.W.2d 322, 329–30 (Mo. Ct. App. 1995), the court examined the question of duty because of an older rule that landowners were liable to passersby only for "artificial" conditions on the land. In rejecting that rule, the court analyzed the duty question under a nuisance theory *first*, using a section of the *Restatement (Second) of Torts* (1965) dealing with nuisance, and then turned to the same question under a negligence theory, consulting a *Restatement* section addressing negligence. *See Jackson*, 904 S.W.2d at 330–31. The court concluded that the duty under both theories was the same. *See id.* at 331. That is why *Baker v.*

61

*Empire District Electric Co.*, 24 S.W.3d 255, 264 (Mo. Ct. App. 2000) and

*Wilkins v. Hendel*, 654 S.W.3d 429, 433 (Mo. Ct. App. 2022), which both

concerned injuries to persons passing by the defendant's property on

foot or by vehicle, treated negligence and nuisance together. *Jackson*

confirms that a nuisance duty is *analytically separate* from a negligence

duty, and one must consult the law of nuisance, not the law of

negligence, to determine the existence of a nuisance duty.

## CONCLUSION

The Court should affirm the district court's denial of the

Defendants' motion to dismiss the Wisconsin, New York, and Ohio

negligence claims.

RESPECTFULLY SUBMITTED this 27th day of November, 2024.

By: s/ Gretchen Freeman Cappio
KELLER ROHRBACK L.L.P.
Gretchen Freeman Cappio
Benjamin Gould
Ryan McDevitt
Garrett Heilman
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
Tel: (206) 623-1900

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,250 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). I relied on the word count of Microsoft 365 Word in preparing this certificate.

2.     This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because the brief—in both its text and its footnotes—has been prepared in 14-point Century Schoolbook font.

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Gretchen Freeman Cappio
Gretchen Freeman Cappio

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of November, 2024, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Gretchen Freeman Cappio
Gretchen Freeman Cappio