No. 24-2350

## IN THE UNITED STATE COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY OF CINCINNATI; CITY OF CLEVELAND; CITY OF SEATTLE;
CITY OF ROCHESTER; CITY OF YONKERS; CITY OF GREEN BAY;
TOWN OF TONAWANDA; CITY OF COLUMBUS; CITY OF KANSAS
CITY; CITY OF INDIANAPOLIS; CITY OF BUFFALO; CITY OF
MADISON; CITY OF MILWAUKEE; CITY OF NEW YORK; CITY OF
PARMA; CITY OF ST. LOUIS; CITY OF BALTIMORE,

Plaintiffs-Appellees,

v.

HYUNDAI MOTOR AMERICA, INC.;  KIA MOTOR AMERICA, INC.,

Defendants-Appellants.

On Appeal from the U.S. District Court
for the Central District of California

## BRIEF OF AMICI CURIAE THE INTERNATIONAL
## MUNICIPAL LAWYERS ASSOCIATION; NATIONAL LEAGUE
## OF CITIES; NATIONAL ASSOCIATION OF COUNTIES;
## AND LEAGUE OF WISCONSIN MUNICIPALITIES
## IN SUPPORT OF PLAINTIFFS-APPELLEES

| | |
|---|---|
| Charlene Koski | Patrick Reimherr |
| Van Ness Feldman LLP | Van Ness Feldman LLP |
| 1191 Second Avenue, Suite 1800 | 1050 Thomas Jefferson St., NW |
| Seattle, WA 98101-2996 | Washington, DC 20007 |
| T: (206) 623-9372 | T: (202) 298-1948 |
| E: ckoski@@vnf.com | E: preimherr@vnf.com |

*Counsel for Amici Curiae*

1359422

# TABLE OF CONTENTS

I.  IDENTITY AND INTEREST OF AMICI CURIAE  AND
    AUTHORITY TO FILE ................................................................ 1

    A.  Identity ............................................................................. 1

    B.  Amici's Interest in the Case ............................................ 2

    C.  Authority to File ............................................................. 3

II.  INTRODUCTION AND SUMMARY OF ARGUMENT ........... 3

III.  RELEVANT FACTUAL BACKGROUND ................................ 5

IV.  ARGUMENT .............................................................................. 6

    A.  Standard of Review ......................................................... 6

    B.  The Public-Nuisance Claims Do Not Rise and Fall
        with the Negligence Claims .............................................. 8

    C.  Public Nuisance Is an Important Tool to Abate
        Dangerous Conditions Such as Those Hyundai-Kia's
        Conduct Created ............................................................. 15

        1.  Limiting Duty Based on Third-Party Criminal
            Conduct Makes No Sense Here and Would Allow
            Corporations to Avoid Accountability for Public
            Harms They Cause ..................................................... 16

        2.  The Public Harms Resulting from Hyundai-Kia's
            Cost-Cutting Measures Are Widespread, Severe,
            and Precisely the Sort of Injuries That Public-
            Nuisance is Designed to Redress ................................ 19

V.  CONCLUSION .......................................................................... 26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AlliedSignal, Inc. v. City of Phoenix,*
  182 F.3d 692 (9th Cir. 1999)................................................. 20

*Barahona v. Union Pac. R.R. Co.,*
  881 F.3d 1122 (9th Cir. 2018)................................................ 7

*City of Jackson v. Morley,*
  606 F. Supp. 434 (S.D. Miss. 1985) .................................... 13

*City of N.Y. v. Magellan Tech., Inc.,*
  No. 23 CIV. 5880 (LLS), 2024 WL 2701956
  (S.D.N.Y. May 24, 2024) ...................................................... 13

*Deutsche Bank Nat'l Tr. Co. v. FDIC,*
  744 F.3d 1124 (9th Cir. 2014)................................................ 7

*Enesco Corp. v. Price/Costco Inc.*
  146 F.3d 1083 (9th Cir. 1998)............................................... 20

*Fortyune v. City of Lomita,*
  766 F.3d 1098 (9th Cir. 2014)................................................ 8

*N.A.A.C.P. v. AcuSport, Inc.,*
  271 F. Supp. 2d 435 (E.D.N.Y. 2003) ................................. 13

*State of N.Y. v. Shore Realty Corp.,*
  759 F.2d 1032 (2d Cir. 1985) .............................................. 10

**State Cases**

*Cincinnati v. Beretta U.S.A. Corp.,*
  768 N.E.2d 1136 (Ohio 2002)............................................... 18

*City of Lee's Summit v. Browning,*
  722 S.W.2d 114 (Mo. Ct. App. 1986) .................................. 19

*City of Rochester v. Premises Located at 10-12 S. Washington St.*,
  687 N.Y.S.2d 523 (N.Y. Sup. Ct. 1998) .......................................... 9, 10

*Commonwealth of Pa. v. Barnes & Tucker Co.*,
  319 A.2d 871 (Pa. 1974) ....................................................................... 12

*Jackson v. City of Blue Springs*,
  904 S.W.2d 322 (Mo. Ct. App. 1995) ................................................... 11

*Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*,
  691 N.W.2d 658 (Wis. 2005) ................................................................. 18

*In re Nat'l Prescription Opiate Litig. v. Purdue Pharma, L.P.*,
  222 N.E.3d 661 (Ohio 2023) ................................................................. 10

*Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*,
  646 N.W.2d 777 (Wis. 2002) ................................................................. 10

*Roth v. City of St. Joseph*,
  164 Mo. App. 26 (Mo. Ct. App. 1912) ................................................... 11

*State v. Errington*,
  317 S.W.2d 326 (Mo. 1958) ................................................................... 19

*State v. Schenectady Chem., Inc.*,
  459 N.Y.S.2d 971 (N.Y. Sup. Ct. 1983) ......................................... 18, 19

*State v. Weller*,
  327 N.W.2d 172 (Wis. Ct. App. 1982) ..................................................... 9

## Statutes and Regulations

28 U.S.C. § 1292(b) ...................................................................................... 6

Motor Vehicle Safety Standard No. 114; Theft Protection;
  Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968) ........................... 16

## Rules

FRAP 29(a) ............................................................................. 1

FRAP 29(a)(2) ....................................................................... 3

FRAP 32-1 ............................................................................. 1

FRAP 32(a) ............................................................................ 1

FRAP 32(f) ............................................................................. 1

FRAP 32(g) ............................................................................ 1

Rule 12(b)(6) ....................................................................... 14

## Other Authorities

John Bourdeau, et al, 58 Am. Jur. 2d, *Nuisances* (2024) ...................... 10

Distributor Settlement Agreement:
https://www.attorneygeneral.gov/wp-content/uploads/2021/07/2021-07-21-Final-Distributor-Settlement-Agreement.pdf ................................................. 14

Env't Law Inst., L. of Env't Prot., § 7:4 (2024) ........................................ 10

Leslie Kendrick, *The Perils and Promise of Public Nuisance*,
132 Yale L.J. 702 (2023) ............................................................ *passim*

Michael J. Purcell, *Settling High: A Common Law Public Nuisance Response to the Opioid Pandemic*, 52 Colum. J. L. and Soc. Problems (2018) .................................... 14

Patricia E. Salkin et al, Land Use Planning and Development Regulation Law, *Public Nuisances* (3 ed. 2023) ....................................................................... 10, 11

Restatement (Second) of Torts, § 821B (1979) ......................................... 9

## I.  IDENTITY AND INTEREST OF AMICI CURIAE AND AUTHORITY TO FILE[1]

### A.  Identity

The International Municipal Lawyers Association (IMLA) has been an advocate and resource for local government attorneys since 1935. Owned solely by its more than 2,500 members, IMLA serves as an international clearinghouse for legal information and cooperation on municipal legal matters. IMLA's mission is to advance the responsible development of municipal law through education and advocacy by providing the collective viewpoint of local governments around the country on legal issues before the Supreme Court of the United States, the United States Courts of Appeals, and state supreme and appellate courts.

The National League of Cities (NLC) was founded in 1924 and is the oldest and largest organization representing U.S. municipal governments. NLC is an organization comprised of city, town, and village leaders focused on improving the quality of life for their current and future constituents. NLC advocates for and protects the interests of

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person made a monetary contribution to the brief's preparation or submission.

cities, towns, and villages by strengthening local leadership, influencing federal policy, and driving innovative solutions.

The National Association of Counties (NACo) is the only national organization that represents county governments in the United States. Founded in 1935, NACo provides essential services to the nation's 3,069 counties through advocacy, education, and research.

The League of Wisconsin Municipalities (LWM) was created in 1898 to help Wisconsin cities and villages share ideas and learn from one another, train and provide information to the people elected and appointed to govern those cities and villages, and to advocate on their behalf. One of the most important missions of LWM is to advocate for state laws and policies that support local government and local control. LWM is a member of NLC.

### B.    Amici's Interest in the Case

Collectively, Amici represent the interests of municipalities and local governments throughout the country. Amici submit this brief to assist this Court in understanding the important and distinct role public nuisance plays in addressing public and societal harms such as

those alleged in this litigation.[2] Contrary to the insinuations of Appellants-Defendants Hyundai Motor Co. Inc., and Kia Motor Co. Inc., (collectively, "Hyundai-Kia"), public nuisance is an independent tort requiring its own factual and legal analysis. It is broader than negligence and does not rise and fall with any specific tort, including negligence. Because the public-nuisance arguments Hyundai-Kia makes were neither developed before the district court nor certified for interlocutory review, this Court should not reach them. Doing so risks confusing two distinct areas of law and frustrating the ability of local governments to use public nuisance as a tool to abate an unreasonable interference with public rights.

## C. Authority to File

All parties have consented to the filing of this amicus brief. Fed. R. App. P. 29(a)(2).

## II.  INTRODUCTION AND SUMMARY OF ARGUMENT

Hyundai-Kia intentionally chose profits over the installation of standard anti-theft technology in certain Hyundai and Kia vehicles. It

---

[2] Amici also agree with Plaintiff-Appellee Municipalities ("Municipalities") that Hyundai-Kia's federal preemption arguments are beyond the scope of this Court's review and, in any event, fail, but Amici submit this brief for the specific purpose of emphasizing the distinct and vital nature of public nuisance as a remedy to abate public harms.

was a risky move that bucked industry standards, and those risks materialized: many of the affected vehicles were, in fact, stolen. Not surprisingly, due to the resulting surge in vehicle theft, public roads and spaces became less safe, public resources were diverted, and crime rates went up. Yet Hyundai-Kia did not pay the price for its lack of due care. Instead, it shifted that cost to local governments.

Hyundai-Kia now argues it cannot be held liable for negligence or public nuisance because a third party stole the vehicles. For reasons stated in the Municipalities' Answering Brief, the law does not work that way. Corporations are not immune from tort liability simply because they manufacture products intended to prevent third-party criminal conduct. Such a result would be absurd. It would also be unfair and inconsistent with the history and purpose of public-nuisance law, which has developed to address precisely the type of harms alleged in this case.

Amici agree with the Municipalities that this Court should limit its review to the certified question: whether with respect to the negligence claims under New York, Ohio, and Wisconsin law, a tort duty to protect against third-party criminal conduct can be based solely

on the foreseeability of harms, even in the absence of a special relationship. 2-ER-116. As stated in the Answering Brief, it can. New York, Ohio, and Wisconsin recognize a duty of reasonable care, and the complaint alleges Hyundai-Kia breached that duty by negligently manufacturing and designing anti-theft equipment.

This Court's inquiry should end there, as that is the only certified question. Public nuisance is distinct from negligence; it requires separate analysis and serves a specific public purpose. Amici write separately to emphasize this distinction and the special role public nuisance plays in addressing the extensive public harms the Municipalities have alleged.

## III.    RELEVANT FACTUAL BACKGROUND

Amici agree with the Statement of the Case in the Answering Brief of the Municipalities. Of particular relevance to Amici is that, although it did not properly develop the issue before the district court, Hyundai-Kia now argues on appeal that the question of "duty" is fundamental not just to the negligence claims based on New York, Ohio, and Wisconsin law, but also to public-nuisance claims in those states and Missouri. OB 42.

The district court expressly rejected Hyundai-Kia's contention that the public-nuisance claims needed to be stayed because they rest on the negligence claims, noting that Hyundai-Kia had failed to "offer more than conclusory statements" in support of that position. 2-ER-113, 116 ("Defendants have also not carried their burden of showing" the certified question "has a bearing on the public nuisance claims brought by seven states."). Accordingly, the court certified the question of duty only as it pertains to the negligence claims and allowed the public-nuisance claims to proceed. 2-ER-116; 28 U.S.C. § 1292(b) (appeal under this section "shall not stay proceedings in the district court" unless so ordered). Notwithstanding the district court's express limitation, Hyundai-Kia now seeks an end-run around the district court to have this Court dismiss the public-nuisance claims of New York, Wisconsin, Ohio, and Missouri. OB 42.

## IV.    ARGUMENT

### A.    Standard of Review

Amici agree with the Municipalities that this Court's jurisdiction is limited to reviewing the negligence claims brought under New York, Ohio, and Wisconsin law. If this Court finds jurisdiction, it should nonetheless decline to reach issues the district court did not certify.

This is especially true here because when seeking certification, Hyundai-Kia failed to develop arguments related to public nuisance or federal preemption. 2-ER-112–13 (describing issues Hyundai-Kia raised in its motion for certification). Reaching those issues now, even though they were not developed before the district court, and therefore not "fairly included within the certified order," would "obliterate the distinction between interlocutory appeals and appeals after final judgment and would encourage circumvention of the conventional appeals process." *Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122, 1130–31 (9th Cir. 2018) (quoting *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 744 F.3d 1124, 1134 (9th Cir. 2014)).

As described in more detail below, this Court should limit its review to the negligence claims for the additional reason that public nuisance is an independent cause of action requiring a separate legal analysis under a separate body of law. The torts are not interdependent and treating them as such would lead to confusion and unjust results, depriving Municipalities of an independent cause of action that is separate from negligence, both generally and as alleged in the complaint.

To the extent this Court grants review, its review is de novo. *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101 (9th Cir. 2014).

## B.  The Public-Nuisance Claims Do Not Rise and Fall with the Negligence Claims

Hyundai-Kia suggests it did not need to develop separate arguments on the public-nuisance claims before the district court because those claims "rest on negligence allegations and fail for lack of a tort duty." OB 42. According to Hyundai-Kia, if the negligence claims fail, so do the public-nuisance claims of New York, Ohio, Wisconsin, and Missouri. *Id.* This misstates and misunderstands the relationship between negligence and public nuisance. It also mischaracterizes the claims brought.

For reasons given in the Municipalities' Answering Brief, the complaint sufficiently states claims for both public nuisance and negligence. But public nuisance does not rise and fall with negligence, either generally or as pleaded in this case. Public nuisance is a distinct cause of action that operates for a specific purpose: to protect public rights. The doctrine originated in English common law, where it allowed the King to bring suit for encroachments on the royal domain or public highway, and soon expanded to address "the invasion of the

8

rights of the public" by such things as interference with operations of a public market, injurious trades and manufactures, selling of products unfit for human consumption, disorderly establishments, the making and selling of fireworks, and smoke from a lime-pit. Leslie Kendrick, *The Perils and Promise of Public Nuisance*, 132 Yale L.J. 702, 713–18, 738–40 (2023) (describing history of public nuisance law) [hereinafter *Kendrick*]; Restatement (Second) of Torts § 821B at cmt. a (1979) [hereinafter *Restatement*].

In the United States, by the middle of the twentieth century, most state legislatures had passed general public-nuisance statutes, providing a statutory basis for actions that had historically proceeded at common law. Restatement at § 821B at cmt. c. In addition to these laws, and independent of them, common-law public nuisance also still exists. *See, e.g.*, *City of Rochester v. Premises Located at 10-12 S. Washington St.*, 687 N.Y.S.2d 523, 526 (N.Y. Sup. Ct. 1998) (applying common-law public nuisance); *State v. Weller*, 327 N.W.2d 172, 177 (Wis. Ct. App. 1982) ("there is no conflict between the authority granted to a trial court to abate a public nuisance under [statute] and its authority to abate a public nuisance pursuant to its common law equitable powers");

9

Patricia E. Salkin et al, Land Use Planning and Development Regulation Law, *Public Nuisances*, § 14.2 (3d ed. 2023) (citing examples) [hereinafter *Salkin*] (a public nuisance "may, but need not, be conduct proscribed by statute or ordinance"); John Bourdeau, et al, 58 Am. Jur. 2d, *Nuisances* § 46 (2024) (same).[3]

Generally, "public nuisance is not founded upon tort, but rather upon the police powers of the state to provide for the protection of public health, welfare, and safety." Env't Law Inst., L. of Env't Prot., § 7:4 (2024). Accordingly, the doctrine does not turn on the existence of an underlying tort. Instead, it allows governments to seek a remedy for certain widespread harmful conditions "irrespective of negligence or fault." *Premises Located at 10-12 S. Washington St.*, 687 N.Y.S.2d at 526; *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir. 1985) (citing cases); *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 646 N.W.2d 777, 792 (Wis. 2002) ("negligence is not a necessary

---

[3] As the district court recognized, 1-ER-15, the Sixth Circuit has certified to the Ohio Supreme Court the question of whether the Ohio Product Liability Act abrogated common-law nuisance resulting from the sale of a product in commerce in which plaintiffs seek equitable abatement, including both monetary and injunctive remedies. *See In re Nat'l Prescription Opiate Litig. v. Purdue Pharma, L.P.*, 222 N.E.3d 661 (Ohio 2023) (accepting certification). The point is not material to this Court's analysis.

ingredient of nuisance") (quoting cases); *Jackson v. City of Blue Springs*, 904 S.W.2d 322, 328 (Mo. Ct. App. 1995) ("not all negligent actions result in a nuisance and proof of negligence is not necessarily required for a finding of nuisance"); *Roth v. City of St. Joseph*, 164 Mo. App. 26 (Mo. Ct. App. 1912) (negligence is not an ingredient of public nuisance).

Public nuisance fills a gap in tort law by providing a cause of action for conditions injuring public health, safety, and "more intangible" "public morals." *Salkin*; *see also Kendrick* at 702 (citing examples). That is because "many traditional tort doctrines," including but not limited to wrongful death, personal injury and products liability, "are limited in their ability to address major societal crises, even when the defendants have admitted to actual crimes." *Kendrick* at 782–84 (noting that "modern tort law is built on the assumption that the regulatory state works well; it is not primed to address its failures"). In this way, public nuisance has become an essential tool for governments to require corporations and industries to internalize the cost of conduct that interferes with public rights, such as the rights to health and safety.

11

For example, in *Commonwealth of Pa. v. Barnes & Tucker Co.*, 319 A.2d 871 (Pa. 1974), Pennsylvania brought a public-nuisance action to require a mining company to stop acid water leaks from a closed mine into the Susquehanna River. The mine had operated legally for decades and had been shut down in conformance with applicable laws. In finding the company liable for common-law public nuisance, the Pennsylvania Supreme Court observed: "The absence of facts supporting concepts of negligence, foreseeability or unlawful conduct is not in the least fatal to a finding of the existence of a common law nuisance." *Id.* at 414. The court dismissed arguments to the contrary as "an entirely mistaken emphasis upon what the defendant has done rather than the result which has followed, and forgets completely the well established fact that negligence is merely one type of conduct which may give rise to a nuisance." *Id.* (citation omitted).

Certainly, negligent conduct can *also* result in a condition that causes a public nuisance, but one does not necessarily rise and fall with the other. Although public nuisance "gains a great deal of its shape from other tort doctrines," its range is both broader and narrower. *Kendrick* at 743–44, 755. Public nuisance is not limited to specific

conduct. Indeed, public-nuisance claims are sometimes brought without any accompanying tort claim whatsoever. *See, e.g.*, *City of Jackson v. Morley*, 606 F. Supp. 434 (S.D. Miss. 1985) (claiming that building was being maintained in manner as to constitute public nuisance); *City of N.Y. v. Magellan Tech., Inc.*, No. 23 CIV. 5880 (LLS), 2024 WL 2701956 (S.D.N.Y. May 24, 2024) (bringing action against distributors of vaping devices and nicotine product manufacturing for violation of state and federal laws, and common law nuisance). Public nuisance is also narrower than negligence because it is limited to conditions that impinge on public rights, whereas "[p]recisely the opposite holds true of individual negligence cases, where the aim is to redress a wrong visited upon a specific injured party by an identified person who owes him or her a specific duty." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 489 (E.D.N.Y. 2003) (citations omitted).

Perhaps most famously, in the 1990s, states included public nuisance as a central claim in their lawsuits against the tobacco industry.[4] Public nuisance also formed the basis of government claims

---

[4] In their Amicus Brief, The Buckeye Institute, focusing on Ohio law, argues that monetary damages are an inappropriate remedy for public nuisance. The brief cites the 1998 tobacco settlement to suggest

13

against opioid manufacturers. *See* Michael J. Purcell, *Settling High: A Common Law Public Nuisance Response to the Opioid Pandemic*, 52 Colum. J. L. and Soc. Problems, 160 (2018); *see also Kendrick* at 705.

Here, the Municipalities have alleged public nuisance based on statutes and common law. They have also alleged that Hyundai-Kia acted intentionally, *see, e.g.*, 3-ER-308, 404–405, 409–412, 416, 427, negligently, and with reckless disregard, by breaching a duty of reasonable care in the manufacturing and design of anti-theft devices, *see, e.g.*, 3-ER-406, 407, 414–415, 417–418, 429–430, 436–437, 442–443. These allegations plead separate torts requiring separate legal and factual analyses, as the district court correctly recognized. 2-ER-113.

---

governments are run by "child-like" politicians who cannot be trusted to manage settlement funds. ECF 21.1 at 19–22. Amici dispute The Buckeye Institute's characterizations and, regardless, how a settlement agreement was drafted 25 years ago in an entirely unrelated context has nothing to do with this case or any other settlement agreement based on public nuisance. For example, the Distributor Master Opioid Settlement Agreement specifically requires that 85 percent of all settlement monies be spent by state and local governments on remediating the opioid crisis. https://www.attorneygeneral.gov/wp-content/uploads/2021/07/2021-07-21-Final-Distributor-Settlement-Agreement.pdf. The tobacco settlement also has nothing to do with the availability of public nuisance as a legal remedy separate from negligence, which is the question before this Court. The Buckeye Institute's arguments lie far beyond the scope of the district court's certification order, the parties' arguments in this interlocutory appeal, and the applicable standards of Rule 12(b)(6).

This Court should therefore limit the scope of its review and decline Hyundai-Kia's invitation to treat public nuisance and negligence as interchangeable torts. They are not interchangeable and treating them as such would cause confusion in the law and needlessly limit the ability of local governments to bring claims for public nuisance.

### C. Public Nuisance Is an Important Tool to Abate Dangerous Conditions Such as Those Hyundai-Kia's Conduct Created

For reasons stated in the Municipalities' Answering Brief, Hyundai-Kia owes a duty of reasonable care in the design and manufacture of anti-theft devices for its cars, which is dispositive of the certified question in this interlocutory appeal. Hyundai-Kia argues against such a duty on grounds no liability exists for public nuisance or negligence based on "third-party criminal conduct." OB 6. That argument fails for reasons stated in the Answering Brief. Amici write separately to emphasize that such a result, in addition to mischaracterizing the complaint's allegations and being wrong as a matter of law, is also dangerous, costly, and would unfairly shift the burden of Hyundai-Kia's cost-cutting measures to local governments

and the public they serve, which is precisely the type of harm public nuisance is intended to guard against.

### 1. Limiting Duty Based on Third-Party Criminal Conduct Makes No Sense Here and Would Allow Corporations to Avoid Accountability for Public Harms They Cause

There can be no serious question that the auto thefts resulting from Hyundai-Kia's conduct constitute a public nuisance. As detailed in the complaint and below, such thefts directly imperil public safety and "constitute a major hazard to life and limb on the highways." 3-ER-326 (quoting Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968)). Stolen vehicles are more likely to cause unreasonable risk of accident, injury, and death. 3-ER-327. They are also more likely to be driven recklessly, particularly here, where Hyundai and Kia vehicles are stolen primarily by inexperienced juvenile drivers who use the vehicles for joyriding, or the commission of other crimes as opposed to parts or resale. 3-ER-327–28.

Indeed, it is easy to predict the harms that defective anti-theft technology would cause: more vehicles stolen, thereby causing more dangerous public roads and spaces, more fatal crashes, more property damage, more personal injury, more juvenile incarceration, more

uninsured drivers on public roads, and the exhaustion of law enforcement and other public resources that would otherwise be available for different public benefits and protections. 3-ER-330–31. It is a crisis of Hyundai-Kia's making, but the public is paying the toll.

Of course, corporations make business decisions all the time. What a corporation may not do is create—without accountability or consequence—a condition that unreasonably interferes with the public's common right to health and safety. Accepting Hyundai-Kia's view of public nuisance as never applying to anti-theft products would allow corporations manufacturing and designing such devices to shift the burden of their reckless cost-cutting measures to local governments and the communities they serve, effectively hijacking local budgets and resources. Such a tactic interferes with local self-government and the autonomy that municipalities have over public spending and other local priorities.

It cannot be the case that, simply because Hyundai-Kia designs and manufactures *anti-theft* devices—which are intended to deter third-party criminal conduct—it is immune from liability when a lack of reasonable care leads to defects in those devices going to the very heart

17

of their intended function. Such a result would shield any corporation manufacturing or designing products intended to deter criminal conduct, despite the corporation's failure to exercise reasonable care. The law does not require this result and Hyundai-Kia has not cited cases holding otherwise. *See* Answering Br. at 22, 24–28, and 48–53 (distinguishing cases and demonstrating that Ohio, Wisconsin, New York, and Missouri recognize an applicable duty of reasonable care).

Corporations who create and maintain public nuisances must be accountable to the communities their conduct harms. Every state put at issue by Hyundai-Kia recognizes the important role of public nuisance in this regard. *See, e.g.*, *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002) ("a public-nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public"); *State v. Schenectady Chem., Inc.*, 459 N.Y.S.2d 971, 978 (N.Y. Sup. Ct. 1983) ("'action lies by the people through the attorney general to abate a public nuisance, and to restrain its continuance, and for damages'") (quotation omitted); *Milwaukee Metro. Sewerage Dist. v. City of*

*Milwaukee*, 691 N.W.2d 658, 670 (Wis. 2005) ("the interest involved in a public nuisance is broader than that in a private nuisance"); *City of Lee's Summit v. Browning*, 722 S.W.2d 114, 115 (Mo. Ct. App. 1986) ("A public nuisance 'annoys, injures, endangers, renders insecure, interferes with, or obstructs rights or property of the whole community'") (quoting *State v. Errington*, 317 S.W.2d 326, 331 (Mo. 1958)). Hyundai-Kia's arguments fail as a matter of law for reasons stated in the Municipalities' Answering Brief. They are also inconsistent with public-nuisance law and its core purpose.

### 2. The Public Harms Resulting from Hyundai-Kia's Cost-Cutting Measures Are Widespread, Severe, and Precisely the Sort of Injuries That Public-Nuisance is Designed to Redress

For hundreds of years, public nuisance has anticipated and allowed for the recovery of the "peculiar and special" nature of public damages. *Kendrick* at 748–49 ("public nuisance has utilized damages since the sixteenth century"). *See also Schenectady*, 459 N.Y.S.2d at 978) ("'action lies by the people through the attorney general to abate public nuisance, and to restrain its continuance, and for damages'") (quotation omitted). It has also helped to "level[] the playing field" by providing a mechanism for local governments to bring legal actions

against well-funded defendants for widespread harms private plaintiffs are often unequipped to litigate. *Kendrick* at 784.

"While imperfect," public nuisance "can hold defendants accountable for past behavior and secure their assistance in abating an ongoing crisis." *Id.* at 785. It has proven "most useful in cases where more standard regulatory tools have failed or been exploited," *id.* at 786, which is precisely the situation here. As alleged in the complaint, Hyundai-Kia intentionally flouted industry standards to cut costs at the expense of public health and safety. The resulting burden on local governments has been significant and far-reaching.

Not surprisingly, Hyundai-Kia's decision to forego industry-standard anti-theft devices led to a clear rise in automobile thefts and significant public harm.[5] Police officers responding to vehicle thefts in the municipalities bringing this suit have been shot, shot at, stabbed, and seriously injured when responding to and/or encountering a Hyundai or Kia theft incident. 3-ER-328–29. Members of the public, including a four-year-old child, have died, 3-ER-329–30, and the need

---

[5] The facts in this section are based on allegations in the complaint, which, at this stage, are taken as true. *Enesco Corp. v. Price/Costco Inc.* 146 F.3d 1083, 1085 (9th Cir. 1998); *AlliedSignal, Inc. v. City of Phoenix*, 182 F.3d 692, 695 (9th Cir. 1999).

for significant police and emergency services related to these thefts has deprived the Municipalities of the ability to combat other crimes or otherwise focus on community protection. 3-ER-331.

The failings of Hyundai-Kia have resulted in burdens, injuries, and costs on local governments nationwide:

For example, Columbus, Ohio reported that its officers spent 4,500 hours responding to stolen Kia and Hyundai incidents simply to complete the reports, compared to 550 hours in 2020 before the Hyundai-Kia crime wave started. 3-ER-356. St. Louis's towing service has also been inundated with requests to tow recovered stolen Kias and Hyundais at significant cost to the city. 3-ER-382. Stolen vehicles in that city also fatally struck a bicyclist, caused significant property damage, and were used in drive-by shootings and other crimes. 3-ER-381–82.

Cincinnati police have reported multiple incidents of drive-by shootings involving stolen Hyundai vehicles, including one on May 31, 2023, when an adult male and three juveniles, ages 10, 14, and 15, were shot by someone in a Hyundai Sonata with temporary tags that was suspected to be stolen. 3-ER-367–68. Less than two months later, a 37-

year-old woman was killed in another drive-by shooting involving a stolen Hyundai. 3-ER-369.

Between 2021 and 2022, the number of Kia vehicles stolen in Parma, Ohio increased by more than 414 percent and thefts of Hyundai vehicles increased by more than 416 percent, a pace that continued into 2023 when the complaint was filed. 3-ER-369. The increased time the city's Uniform Patrol Division had to spend responding to stolen Hyundai and Kia vehicles diverted them from other important duties. 3-ER-371. Like the other Municipalities, Parma has experienced multiple high-speed police chases involving stolen Hyundai and Kia vehicles driven by teenagers. These pursuits included incidents in which the vehicles sped through construction zones, crashed into an apartment building, ran multiple stop signs, crashed into a utility pole, and crashed into a home with a 25-year-old woman and her infant inside. 3-ER-371–72.

The wave of vehicle thefts that led to this lawsuit started in Milwaukee. 3-ER-336. There, Hyundai and Kia vehicle thefts comprise most of the cars stolen, a statistic that rose sharply after a group of teenagers began posting "how-to" videos detailing how to steal Hyundai

and Kia vehicles lacking the anti-theft immobilizer device at issue in this litigation. 3-ER-324, 336. Nearly half the individuals arrested for car theft in Milwaukee that year were 16 years old or younger, 3-ER-337, and multiple people, including juveniles, pedestrians, and innocent bystanders, have been killed in accidents involving stolen Hyundais and Kias. 3-ER-337–341. In 2020, when automobile thefts initially rose, traffic fatalities in the city increased by 50 percent and remained elevated in 2021 and 2022. 3-ER-342–43. In June 2021, a 16-year-old was killed, and his 12-year-old accomplices were seriously injured when they stole a Kia Sportage and collided with another car. 3-ER-339. In January 2023, five juveniles suspected as being involved in an armed robbery crashed a stolen Kia into another car, killing its passenger and seriously injuring its driver. 3-ER-340.

In Madison, Wisconsin, thefts of Kia vehicles rose by more than 124 percent between 2021 and 2022. 3-ER-344–45. In 2021, police officers spent 848.75 hours responding to stolen Hyundai and Kia incidents and in 2022, spent 1,256.32 hours responding to stolen Hyundai and Kia incidents, placing additional stress on the city's already limited resources. 3-ER-346. As in Milwaukee, most of the

23

individuals arrested for these thefts were juveniles, including an 11-year-old. 3-ER-347.

In Green Bay, in 2023, Hyundai and Kia vehicles accounted for 35 percent of all motor vehicle thefts, up from five percent in 2020. 3-ER-347–48. As a result, law enforcement officers have been forced to spend more time responding to stolen Hyundai and Kia vehicles, which have also been used to commit other crimes. 3-ER-348. Similarly, in Kansas City, Missouri, Kia and Hyundai vehicles accounted for 47 percent of all stolen vehicles and have created a "serious public health and safety crisis." 3-ER-383–84.

The New York City Police Department's Crime Prevention and Community Outreach Divisions have been forced to launch a public awareness campaign to alert the public and prevent Hyundai and Kia vehicle thefts, and the police department has purchased and distributed steering wheel locks and tracking devices to owners of Hyundai and Kia vehicles. 3-ER-395–96.

In Indianapolis, while rates of vehicle thefts generally have been declining, the rate of Kia and Hyundai vehicle thefts has gone up nearly 400 percent. 3-ER-401. In February 2023, two juveniles in a stolen

Hyundai Sonata led police on a chase and eventually crashed on an interstate. 3-ER-401. The vehicle contained six guns, two of which were loaded, a backpack full of ammunition, and a grenade launcher. 3-ER-401. In the first half of 2023, there were 11 violent incidents involving a stolen Hyundai or Kia, including two shootings and ten robberies. 3-ER-402.

During the first part of 2023, the Baltimore Police Department expended about 1,750 additional hours responding to thefts of Hyundai and Kia vehicles and that figure was expected to double by the end of the year. 3-ER-374. This does not include hours spent in follow-up investigations, prosecutions, and officer court appearances. 3-ER-375. In Seattle, where thefts for Hyundai and Kia vehicles increased by 363 percent and 503 percent, respectively, from 2021 to 2022, suspects used a stolen Kia sedan to smash through the windows of a recreational marijuana business. 3-ER-378–79.

For the first five months of 2023, Buffalo, New York reported 471 thefts of Hyundai vehicles and 689 thefts of Kia vehicles, an increase of more than 2,000 percent. 3-ER-384–85. In Rochester, New York, in the first six months of 2023 alone, patrol officers' time spent responding to

Hyundai and Kia thefts increased 405 percent from total time spent in 2022, 3-ER-384. On one occasion, a stolen Kia SUV was recklessly driven at high speeds over sidewalks and lawns at a local high school, with more than 600 students in attendance. 3-ER-388.

The complaint is replete with such harms: unreasonable interference with public spaces, health, safety, and resources, i.e., public nuisances. The law anticipates and provides a remedy for such harms under standards distinct from negligence. For these reasons, and because Hyundai-Kia's public-nuisance arguments were not developed before the district court or certified for interlocutory review, this Court should decline to reach them. If it does reach them, those claims should survive dismissal for reasons stated in the Answering Brief.

## V. CONCLUSION

For reasons stated herein and in the Answering Brief of the Municipalities, this Court should not reach any uncertified questions, including the public-nuisance claims. Even if this Court disagrees that the Municipalities have stated negligence claims, that should have no bearing on the public-nuisance claims. Instead, this Court should reject Hyundai-Kia's attempt to shift the burden of its cost-cutting measures

to local governments. Corporations manufacturing and designing products intended to deter criminal activity cannot avoid liability for public harms simply because their products are intended to prevent third-party conduct. Such a result is inconsistent with the law, history, and purpose of public nuisance as a legal doctrine, and offends notions of fairness.

Respectfully submitted this 4th of December, 2024.

*s/Charlene Koski*
Charlene Koski
VAN NESS FELDMAN LLP
1191 Second Ave., Suite 1800
Seattle, WA 98101
T: (206) 623-9372
E: ckoski@vnf.com

*s/Patrick Reimherr*
Patrick Reimherr
Van Ness Feldman LLP
1050 Thomas Jefferson St., NW
Washington, DC 20007
T: (202) 298-1948
E: preimherr@vnf.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a), 32(a), and 32(g), and Circuit Rule 32-1, I hereby certify that the foregoing Amici Curiae Brief of the International Municipal Lawyers Association, the National League of Cities, the National Association of Counties, and the League of Wisconsin Municipalities in Support of Plaintiff-Appellee municipalities has been prepared in a proportionally spaced typeface (using Microsoft Word 365, in 14-point Century Schoolbook font), contains 5,181 words total, excluding items exempted by Federal Rule of Appellate Procedure 32(f).

Respectfully submitted this 4th day of December, 2024.

*s/Charlene Koski*
Charlene Koski
VAN NESS FELDMAN LLP
1191 Second Ave., Suite 1800
Seattle, WA 98101
T: (206) 623-9372
E: ckoski@vnf.com

*Counsel for Amici Curiae*

1

**CERTIFICATE OF SERVICE FOR ELECTRONIC FILING**

I hereby certify that on December 4, 2024, I caused the foregoing document to be filed with the Clerk of the Court for the United States Court of Appeals of the Ninth Circuit using Electronic Filing System, which will automatically serve electronic copies on all counsel of record.

Respectfully submitted this 4th day of December, 2024.

*s/Charlene Koski*
Charlene Koski
VAN NESS FELDMAN LLP
1191 Second Ave., Suite 1800
Seattle, WA 98101
T: (206) 623-9372
E: ckoski@vnf.com

*Counsel for Amici Curiae*

1